871 A.2d 554

Barry J. RENBAUM

v.

CUSTOM HOLDING, INC., et al.

No. 78, Sept. Term, 2004.

Court of Appeals of Maryland.

April 4, 2005.

Barry J. Renbaum (Barry J. Renbaum, LLC, on brief), Glyndon, for petitioner.

Jeffrey L. Forman (Kauffman and Forman, P.A., on brief), K. Donald Proctor ( Proctor & McKee, P.A., on brief), Towson, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

On 3 June 2002 Michael Renbaum (Michael) filed in the Circuit Court for Baltimore County a petition for the involuntary dissolution of Custom Holding, Incorporated ("Custom"), a closely held Maryland corporation, claiming that the directors of Custom were "so divided respecting management" of Custom that the "votes required for action by the board" could not be obtained. Michael, the majority shareholder of Custom (holding 53.86% of its capital stock)[1] and a director, alleged that the four directors of Custom were deadlocked as to whether dividends should be declared and whether the

---

1. Custom's amended Articles of Incorporation stated that its capital stock was divided into two classes which were "identical in every respect except for voting rights in the election of directors."

Treasurer of Custom, Barry Renbaum (Barry), Michael's brother, possessed the authority to act unilaterally on behalf of Custom. The court appointed counsel for Custom because the board of directors (Barry, Michael, and their respective wives) could not agree on counsel for these proceedings. Barry, owner of 20.9% of the total capital stock of Custom, later intervened on his own behalf as a minority shareholder.

After a March trial on the merits, the Circuit Court denied Michael's petition in a written order entered on 7 May 2003; however, the court subsequently granted Michael's motion to alter or amend judgment and admit additional evidence arising after the trial ended. Presumably moved by that additional evidence, the court ultimately ordered dissolution of Custom under § 3–413(a)(1) of the Corporations & Associations Article. Md.Code (1975, 1999 Repl.Vol.). Barry appealed on numerous grounds to the Court of Special Appeals, which affirmed the judgment in an unreported opinion filed on 17 September 2004.

 Barry petitioned this Court for a writ of certiorari. We granted his petition and issued the writ, *Renbaum v. Custom Holding*, 383 Md. 256, 858 A.2d 1017 (2004), to consider the following three questions framed in his petition, which we reorder and restate for clarification.[2]

I. Did the trial court abuse its discretion in granting the post-judgment motion on the basis of operative facts distinct from and occurring subsequent to those adduced at trial?

II. May a court properly order dissolution of a corporation because its directors are divided on one or more issues without record evidence or a finding that the

---

**2.** Barry raised a fourth question in his brief (arguing a perceived pleading insufficiency in Michael's petition for involuntary dissolution) that was not presented in his petition for writ of certiorari. We ordinarily do not, and in this case shall not, consider an issue not raised in a petition for certiorari. Md. Rule 8-131(b); *Calvert Joint Venture #140 v. Snider*, 373 Md. 18, 31 n. 8, 816 A.2d 854, 861 n. 8 (2003).

impasse impaired the successful conduct of the company's day-to-day business affairs?

III. Did the trial court commit prejudicial error in appointing independent counsel for Custom over the objection of an attorney / party / shareholder / director / officer who purported to represent the interests of the corporation?

We shall reverse in part and affirm in part the judgment of the Court of Special Appeals. Although the first two questions, at the time certiorari was granted, portended matters of substantial legal significance and novelty, for reasons we shall explain and upon closer consideration of the record and analysis, the results reached are rather a more prosaic set of conclusions.

## I.

### A.

The material facts were not disputed. Custom was incorporated on 7 January 1993 in Baltimore County under the General Corporation Law of the Corporations and Associations Article of the Maryland Code. Its stated purpose in the Articles of Incorporation is to "invest in securities of all kinds." Like other corporations in Maryland, the Articles included the ability to conduct any related or unrelated business activity to its purpose and all of the general powers granted a Maryland corporation under § 2–103 of the Maryland Corporations and Associations Article. Md.Code (1975, 1999 Repl.Vol.).[3]

Custom was the offspring of the sale of Custom Savings Bank ("Custom Savings") to Household International in 1993. Barry and Michael were the sole shareholders of Custom Savings at the time of sale. The approximately $40 million in

---

3. All subsequent citations to the Corporations and Associations Article, unless otherwise noted, will be to the 1999 Replacement Volume of the 1975 Corporations and Associations Article, the edition in effect at the time of the trial on the merits.

proceeds from the sale of Custom Savings funded Custom's investment activities pursuant to its corporate charter.[4]

Custom originally had five directors; however, its Articles were amended to reduce that number to four, a decision that enabled the present litigation. A unanimous joint director and shareholder agreement on 15 June 1993 ordered the surrender and retirement of all of the existing shares of capital stock and reissued new shares to the current shareholders in two classes Class B for Barry Renbaum and Class M for Michael Renbaum. Custom's President, Michael, and its Secretary, Barry, subsequently filed Articles of Amendment adopted by the directors and shareholders, permitting each class of stock the right to elect two of the four directors.[5] As a result of these changes, Custom had (and currently has) two "Class B Directors" (Barry and his wife, Carol) and two "Class M Directors" (Michael and his wife) elected by their respective class of shareholders.

Following these changes, there were 29,663 Class M shares controlled by Michael and his family and 22,837 Class B shares controlled by Barry and his family.[6] Each share of Class M or Class B stock had identical rights to dividends and an equal distribution per share of the corporation's assets upon liquidation. As a result, any dividend or distribution of

---

**4.** The exact legal maneuvers regarding the buyout of Custom Savings, the relationship between Custom Savings and Custom, and the distribution of proceeds from that buyout are not before us.

**5.** Michael (President) and Barry (Vice-President, Secretary, and Treasurer) were the sole officers and employees of Custom. As employees of Custom, Barry and Michael each received a $500,000 salary, medical insurance, and a retirement plan.

**6.** As of a 14 November 2003 filing made by Michael in anticipation of liquidation, Michael owned 28,275 Class M shares and his sons, Mark and Steven Renbaum, each owned 694 Class M shares. Barry owned 10,950 shares of Class B stock directly and had contributed 10,500 shares of Class B shares to an irrevocable trust. His sons, Bryan and Brandon, owned directly 694 and 693 Class B shares, respectively. The reported value of Custom's corporate assets on 28 February 2003 was $24,962,929.57; the reported value on 14 November 2003 was $30,126,232.46.

assets to the combined shareholders was distributed equally among all of the shareholders, regardless of class.

Custom's by-laws also stated that the Board of Directors "may appoint" a general counsel. The by-laws further stated that "[i]t shall be the duty of the Officers and Directors to consult from time to time with the general counsel (if one has been appointed), as legal matters arise." The general counsel could be removed and replaced only by the Board of Directors.

In 1995, the Board of Directors approved an annual dividend of $4 million, payable on 4 January 1995. Subsequent annual dividends ranging from $2.5 million to $4 million were paid in January of each year from 1996 until 2001 upon informal director approval, generally by way of an oral agreement. While these payments were made in January, they were dividend distributions pertaining to the preceding calendar year.

In late 2001, Barry and Michael disagreed over the annual dividend for 2001, to be paid in January 2002. Barry refused to support any dividend amount; Michael desired at least a $3 million dividend. Custom's board of directors did not declare a dividend for 2001.

Contrary to the dispute over the distribution of dividends (which was debated, at least in part, in terms of the substantial decrease at the time in the market value of Custom's marketable securities portfolio), both Barry and Michael (and their wives) were able to agree on the selection of a professional manager, the Vanguard Group, for Custom's investment holdings. Neither Barry nor Michael disagreed as to the management of Custom's investments and, even during the conflicts that gave rise to this litigation, teleconferenced regularly with Vanguard personnel concerning the asset allocation and investment strategy for Custom's holdings.

Concurrent with the dispute over dividends, Barry also disagreed with Custom's corporate counsel, Shale Stiller (who was also Michael's personal attorney), over a legal bill sent to the corporation. Although Custom's by-laws reposed the power to appoint or remove Custom's counsel solely in the board

of directors, Barry, on his own behalf, sent a letter dated 29 May 2002 requesting that Mr. Stiller step down as corporate counsel and refusing to pay any further billings from Mr. Stiller's law firm.

### B.

Unwilling to face the prospect of his personal and familial financial commitments in 2002 without a dividend payout and seemingly at odds with his brother, Michael filed in the Circuit Court his petition for involuntary dissolution, pursuant to § 3–413(a)(1), on 3 June 2002.[7] His petition stated that the board of directors "have been deadlocked" on the question of dividends. In addition, "the directors are deadlocked on the question of the authority of Barry J. Renbaum, as Treasurer of the Corporation, to take certain actions on behalf of the Corporation," to wit, the situation regarding corporate counsel. The petition also alleged that the board would be unable to agree to counsel for Custom in the litigation because Custom's general counsel (Stiller) was also Michael's private attorney. Michael also filed contemporaneously a motion to appoint counsel for Custom in the litigation.

The motion to appoint counsel was granted on 3 June 2002 and Jeffrey Forman, Esq., was appointed as counsel for Custom for purposes of the litigation. On 18 June 2002, Barry moved to vacate Forman's appointment and to intervene.[8] In

---

7. § 3–413 states, in relevant part,

§ **3–413. Grounds for petition by stockholders or creditors for involuntary dissolution.**

(a) *By stockholders with 25 percent voting power.*—Stockholders entitled to cast at least 25 percent of all the votes entitled to be cast in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that:

(1) The directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained; or

(2) The stockholders are so divided that directors cannot be elected.

8. Barry, an attorney admitted to the Bar of Maryland, initially mustered his legal defense *pro se* in the Circuit Court. He retained counsel for

his motion, Barry asserted that Custom had a constitutional right to choose its own counsel (which, in his opinion, was himself) and that there was no statutory authority for an *ex parte* appointment of counsel for the corporation in an involuntary dissolution proceeding. Although the court struck its 3 June order and ordered a hearing to determine appropriate counsel for Custom, it determined as the result of the hearing that the directors, and particularly Michael and Barry, could not agree on appropriate counsel and re-appointed Forman as counsel for Custom. Barry's intervention was allowed.

On 21 November 2002, a special meeting of the board of directors was called by Barry in an attempt to resolve the dividend deadlock. Both Michael and Barry presented proposals to the Board. Michael presented eleven resolutions, of which two (that were not approved) are material to this appeal. First, the Board failed to approve a resolution (by a 2–2 vote) to confirm Shale Stiller and his law firm as counsel for Custom. The second resolution called for a $3 million dividend distribution, payable in January 2003, and provided that the Class M Directors would possess the sole right to declare future annual dividends so long as the dividend did not exceed fifteen percent of the fair market value of Custom's investment portfolio. Although Barry and Carol Renbaum, the Class B Directors, professed that they would approve the $3 million dividend proposal were it standing alone, they rejected the package assertedly because of the attached grant to the Class M Directors of the sole right to declare future dividends. Barry presented one resolution, a $4 million dividend, payable in January 2003. This proposal also was not approved after Michael and his wife, the Class M Directors, voted against it.

On 25 and 27 March 2003, Michael, Carol, and Barry Renbaum testified in the Circuit Court at a merits hearing on Michael's petition for involuntary dissolution. At the end of the second day, the Circuit Court declared from the bench

---

the trial on the merits in March; however, in all subsequent proceedings (including before this Court), Barry appeared *pro se.*

that "the facts convince me that the directors are not so divided respecting management of corporate affairs that they cannot operate." On the issue of dividends, the Circuit Court concluded:

> Even though it is a weak year that doesn't necessarily mean to me maybe you shouldn't declare dividends. If I'm right, only those two know that. If I am right, Barry's position on that isn't then a viable one because the dividends aren't to split up profits only.

> \* \* \* \* \* \*

> I think the dividend is an issue, but there is more to it than meets the eye. I believe that in 2002, payable in 2003, Barry Renbaum was willing to vote for a dividend up to $4 million. Three million would satisfy the construction in the case. Three million would be satisfactory to Michael Renbaum, too. But he wants total control of the dividends, up to 15 percent of the value of the stocks, which would be around three to four million.

> There is a question as to whether that violates existing law. Barry Renbaum's counsel says, it does. Mr. Proctor, Michael Renbaum's counsel says, it doesn't. Barry believes it does. I think that is the issue.

> Barry believed it did. Whether right or wrong, if he believed in good faith that it did, he has an obligation to vote against that, just vote for straight dividends.

As to corporate counsel for Custom, the Circuit Court concluded that there was no issue for deadlock among the directors at that time (unlike the November special board meeting). The judge stated that "[Barry] testified under oath that ... the lawyer is Shale Stiller. . . . He is not contesting that he doesn't have the authority to hire or fire [Custom's corporate counsel]."

While awaiting the entry of judgment, which occurred on 7 May 2003, Michael attempted to obtain approval from the board of directors for a $4 million dividend distribution. Initially, Barry claimed that he wanted to wait for the appeal period to expire on the Circuit Court's judgment before agree-

ing to meet to declare a dividend. On 10 April 2003, Michael called a special meeting of the board for 21 April 2003, but Barry and his wife could not attend. Michael wrote to Barry on 21 April stating that the special meeting was rescheduled for 30 April 2003, at which time a vote would be taken on a resolution for a $2 million dividend, payable on 6 May 2003, and a second $2 million dividend, payable on 13 January 2004. Michael attached a copy of a Proposed Director Consent Form approving the dividend distributions as proposed and requested that Barry and Carol Renbaum sign and fax it back to him in the event they could not attend the rescheduled meeting. Barry responded by letter on 29 April 2003, stating that the Class B Directors would approve a $4 million dividend "upon a determination by Bar Counsel [of the Attorney Grievance Commission of Maryland] that [Michael's] counsel[9] did not engage in sanctionable conduct in the course of prosecuting your lawsuit to dissolve Custom." On 8 May 2003, Michael sent Barry a letter stating that if he and his wife would not sign the Director Consent Form, Michael would apply for relief from the Circuit Court. Barry and Carol did not return the Proposed Director Consent Form.

Michael filed with the court on 19 May 2003 a motion to alter or amend judgment[10] asserting that the deadlock between the directors persisted despite Barry's in-court testimony that he would vote for a dividend distribution. At a hearing on 12 August 2003, the court granted the motion and entered an order on 19 August 2003 re-opening the 7 May 2003 judgment. At the same hearing, the Circuit Court also granted Michael's request to present additional evidence on "additional issues that arose after the hearing in March. . . ."

---

9. Mr. Stiller did not represent Michael in the course of the litigation. Michael engaged other counsel for that purpose.

10. As indicated previously, the entry of the judgment that was the object of the motion occurred on 7 May 2003. With 8 May counting as the first day, the tenth day fell on 17 May 2003, a Saturday. Michael filed his motion on Monday, 19 May, the last day for filing the motion under Md. Rule 2–534. Md. Rule 1–203 (directing the manner of computing a period of time prescribed by the Maryland Rules).

The taking of additional evidence was scheduled for 22 September 2003. On the eve of renewed battle, however, Barry and Carol signed Michael's Proposed Director Consent Form, capitulating to Michael's request for $4 million in dividends.

The hearing went forward nonetheless. Michael testified, among other things, to his repeated attempts to procure a majority vote or other form of approval for dividend distributions from the board of directors after the March hearings. He alleged that the Director Consent Form, signed and delivered on 18 September 2003, "comes much too late to accomplish its desired purpose." For his part, Barry stipulated, "[f]or the record and this will be construed against me. We'll take great issue with the fact that Shale Stiller is general counsel of Custom, and if the court can construe that as a deadlock issue, we will concede that issue."

On 4 November, the Circuit Court rendered its oral opinion granting the petition for involuntary dissolution of Custom. The court stated that the decision regarding general counsel for Custom was at an "impasse" and a "material decision to be made in the operation of and in conducting duties of the corporation." As to dividends, the Circuit Court stated, "[w]ith that impasse [over general counsel] you can assume that the issue with dividends would never ever come to a resolution. Therefore, I am going to grant the motion for reconsideration and grant dissolution." An order was entered later that day declaring that "pursuant to Maryland Rule 2–534 and received additional evidence" the "directors of Custom Holding, Inc. are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained...."

Barry filed a timely appeal with the Court of Special Appeals.[11] Forman filed a reply brief on Custom's behalf supporting Barry in his contention that involuntary dissolution

---

11. The Court of Special Appeals stayed the liquidation of Custom in order to decide Barry's appeal. We also stayed the liquidation to consider the present case.

was wrongfully ordered and that the grant of the motion to alter or amend judgment was an abuse of the trial judge's discretion.[12]

The Court of Special Appeals affirmed the Circuit Court's order, stating in its unreported opinion that a deadlock between the directors of a holding corporation, like Custom, regarding the distribution of dividends was "sufficient cause" for involuntary dissolution.[13] The intermediate appellate court also stated that the additional evidence admitted after granting the motion to alter or amend judgment reflected that the evidence in the March trial indicating Barry's agreement to approve the payment of dividends became an invalid basis for initially denying relief to Michael. As a result, the Court of Special Appeals stated that the Circuit Court did not err in admitting the additional evidence demonstrating that there was no such agreement. Lastly, the intermediate appellate court concluded that the Circuit Court did not err when it appointed special counsel for Custom because the directors could not identify a mutually agreeable counsel for the present litigation.

## II.

■ Barry challenges the trial judge's exercise of discretion in granting the motion to amend or alter judgment and

---

12. We have before us a similar alignment of the parties. Barry is the petitioner. Forman, as appointed counsel for Custom (both Michael and Barry sought to remove him at various stages of the proceedings), filed a reply brief, essentially supporting Barry on the first two issues. He naturally differs from Barry on the appropriateness of court-appointed counsel for Custom. We will refer in this opinion to arguments by Custom as a party in this appeal as "Forman" to avoid confusion with references to Custom in its non-party capacity. We granted Michael leave to submit a reply brief to Forman's brief because of the parties' alignment on the issues.

13. Foreshadowing our refusal to consider an issue not raised in Barry's petition for writ of certiorari, *supra* note 1, the Court of Special Appeals also refused to address the same issue because Barry did not present it in his appellant's brief, raising it for the first time instead in his reply brief. *See* Md. Rule 8–131(a).

ultimately the petition for involuntary dissolution. *See* Md. Rule 2–534; § 3–413.[14] We begin by reminding ourselves of the proper standard of appellate review.

 Before finding an abuse of discretion we would need to agree that, " 'the decision under consideration [is] well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' " *In re Yve S.*, 373 Md. 551, 583–84, 819 A.2d 1030, 1049 (2003) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312–13, 701 A.2d 110, 118–19 (1997) (some internal citations omitted)). Decisions on matters of law are reviewed *de novo*. *Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004) (interpretations of the Maryland Code and the Maryland Rules are reviewed *de novo* ); *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004) (interpretations of Maryland statutory and case law are conducted under a *de novo* review).

## III.

 Barry first contends that the Circuit Court abused its discretion in granting Michael's motion to alter or amend judgment and in allowing proof of facts that occurred after judgment had been rendered. We shall reject his argument because he overlooks the correct application of Rule 2–534 and miscasts the relevant events. Judgment had not been entered

---

14. Michael correctly argues that the court's action predicated on the Maryland involuntary dissolution statute is reviewed under an abuse of discretion standard. Section (a) of § 79A of Article 23 (Chapter 649 of the 1967 Laws of Maryland, the predecessor) and the current § 3–413 stated the grounds on which a party may petition a court of equity for involuntary dissolution. Former § 79A (c) stated as the procedure by which such a court may grant involuntary dissolution within the court's "sound judicial discretion." Upon re-enactment into the Corporations and Associations Article (Chapter 311 of the 1975 Laws of Maryland), the discretionary procedure portion of § 79A (c) became § 3–414. There is no difference between "sound judicial discretion" and "ordinary" judicial discretion in the exercise of equitable jurisdiction in the courts of Maryland. *See* Md.Code (1975), § 3–411 of the Corporations and Associations Article, Revisor's Note.

when the additional evidence arose that prompted the granting of the motion.

Rule 2–534 states:

In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

Maryland Rule 2–534 is an analog to the Federal Rules of Civil Procedure 52(b) and 59(a), but is more expansive than the federal rules. *Commentary on the New Maryland Rules of Civil Procedure*, 43 Md. L.Rev. 669, 811–12 (1984). Barry alleges that, like its federal counterpart, Rule 2–534 is "confined to evidence existing at the time of trial." If it were not, he says, there would be a "perpetual continuation of lawsuits," witnessed here by Michael and his motion. If Barry is correct, the post-trial efforts that failed to produce a distribution dividend may not be relied upon by the Circuit Court to justify granting Michael's motion to alter or amend judgment.

Forman agrees with Barry as to the desired conclusion but argues for reaching it by a different path. Forman states that "the question goes to whether Circuit Courts have the inherent authority to re-open a case to take evidence of events that transpired after the trial and after the judgment."

Michael disagrees with both and cites to authority that, where newly discovered evidence bears directly on a previous proceeding, relief "should be granted" to the movant. He points out the not-so-subtle irony (in Barry's argument) that, without leave to alter or amend the Circuit Court's judgment, Barry could "perpetually continue" to refuse to approve a dividend distribution despite his contrary testimony on 27 March 2003 that he would agree to a dividend. As such, the post–27 March failed attempts to approve a dividend distribu-

tion show the sham of Barry's testimony when he claimed that he was willing to vote for either a $3 million or $4 million dividend distribution without any conditions attached. Michael states that the Circuit Court's 27 March 2003 oral opinion denying dissolution hinged upon Barry's expressed willingness to agree to an unencumbered dividend.

■ Barry's argument overlooks the correct milestones. The key date for purposes of proper analysis of this issue is the date of entry of judgment, not the date of the court's oral opinion. Indeed, a motion to alter or amend a judgment may not be entertained (and is generally a nullity) until entry of the subject judgment. *Tierco Maryland, Inc. v. Williams,* 381 Md. 378, 398, 849 A.2d 504, 516 (2004); [15] *Atlantic Food & Beverage Systems, Inc. v. City of Annapolis,* 70 Md.App. 721, 725, 523 A.2d 648, 649–50 (1987) (holding that a motion to alter or amend judgment is invalid unless filed after the date of entry of judgment).

■ The facts recounted in the additional evidence presented to the Circuit Court on 22 September 2003 occurred before the initial judgment was entered on 7 May 2003, despite the passage of almost two months from the oral opinion rendered on 27 March. There is no judgment merely because an oral opinion is rendered. Md. Rule 2–601; *Claibourne v. Willis,* 347 Md. 684, 691, 702 A.2d 293, 296 (1997) (holding that the issuance of a final order and the entry of that order into the docket are the required acts for a judgment). As Rule 2–534 indicates, the Circuit Court retains almost a full measure of its discretion regarding a motion filed within ten days following the entry of judgment. Rule 2–534 is simply a measure by

---

**15.** In *Tierco* we clarified some ambiguity in interpreting the Maryland Rules for post-judgment relief in an effort to "unsnare a procedural trap for the unwary." 381 Md. at 381, 849 A.2d at 506. While Rule 2–534 was not squarely at issue in *Tierco* (*Tierco* involved a jury trial where Rule 2–532 was at issue), we explained nonetheless that Rule 2–534 granted trial courts wide discretion to open a judgment, receive additional evidence, and amend or alter the judgment and findings. *Id.* at 398, 849 A.2d at 516; *see also* Paul V. Niemeyer et al., *Maryland Rules Commentary* 456 (3rd ed.2003).

which, in this case, one party brought to light additional evidence that may cause the trial judge to enter a different, more appropriate judgment.

The tendered evidence here (Barry's asserted continuing refusal to grant an unencumbered dividend) was not, as Forman fears, a re-opening of a case to take "evidence of events after the trial and after the judgement." It is quite obvious that the facts presented by the new evidence arose before the judgment was entered.

■ Even though the trial court's discretion in such circumstances is wide, it cannot be exercised unevenly. The responding party must have an opportunity to address the merits of the Rule 2–534 motion (and the request to receive additional evidence). Paul V. Niemeyer et al., *Maryland Rules Commentary* 456 (3rd ed.2003) (stating that before a court may grant a Rule 2–534 motion, a hearing must be held in accordance with Rule 2–311(e)).

In this case, Michael filed his motion within the ten days allowed by Rule 2–534. The trial court held a hearing to determine whether to vacate the 7 May 2003 judgment. It also held a hearing to determine whether additional relevant evidence regarding further consideration of dividend distributions, available only after the 27 March trial, should be admitted. Barry was present at these hearings. By limiting the additional evidence to events that occurred after the last day of the March trial, the Circuit Court exercised its wide discretion to foreclose Barry's fear of the "perpetually continued" lawsuit and "do whatever is necessary to correct the original decision." Niemeyer et al., *supra*, at 456. After the 7 May judgment was opened on 19 August 2003, the Circuit Court was free to consider additional admissible evidence in the matter. The Circuit Court did not abuse its discretion in granting Michael's motion to alter or amend judgment.

## IV.

We now turn to consideration of the merits of the decision to order dissolution. We conclude it to be devoid of sufficient

substance to warrant that relief in the face of the statutory protection the General Assembly and this Court extend to general corporations.

■ Historically, Maryland has been reluctant to expand the equity jurisdiction of courts to include the ability to grant petitions for involuntary dissolution of a corporation without express authorization by statute,[16] unlike some other states that seem more willing to do so. *E.g., Mason v. Supreme Court of Equitable League of America of Baltimore City*, 77 Md. 483, 484, 27 A. 171, 171 (1893) (holding that "[a]part from statutory power, a court of equity cannot dissolve a corporation"); *see* 2 George D. Hornstein, *Corporation Law and Practice*, § 816 at 359, n. 48 (1959) (observing that California, Colorado, Illinois, Maryland, Massachusetts, Nebraska, Ohio, South Dakota, and Utah denied equity courts jurisdiction to order dissolution without a grant of specific statutory power); *but see Bonavita v. Corbo*, 300 N.J.Super. 179, 692 A.2d 119, 120 (1996) citing *Brenner v. Berkowitz*, 134 N.J. 488, 634 A.2d 1019 (1993) (permitting a complaint for dissolution to advance on New Jersey common law grounds and statutory grounds); *In re Dubonnet Scarfs, Inc.*, 105 A.D.2d 339, 484 N.Y.S.2d 541, 543 (N.Y.App.Div.1985) (citing *Leibert v. Clapp*, 13 N.Y.2d 313, 247 N.Y.S.2d 102, 196 N.E.2d 540 (1963)).[17]

---

16. This common law reluctance to extend equity jurisdiction in this area is a useful vestige from English law. Under English law, corporations existed by grant of the Sovereign and the right to compel dissolution of the corporation was vested solely in the Sovereign. 3 *Model Bus. Corp. Act Annotated*, 14–406 (3rd Ed.2000/01/02 Supp.). An equity court, absent statutory authority, could grant an injunction to prevent an unlawful act by a corporation, but could not order dissolution. *See Mason*, 77 Md. at 485, 27 A. at 171.

17. We could find only one Maryland case where a court, exercising its equity jurisdiction in the absence of statutory guidance, ordered the sale of the assets of a corporation in receivership—resulting in the involuntary dissolution of a corporation. In *Hagerstown Furniture Co. v. Baker*, 158 Md. 574, 579, 149 A. 556, 559 (1930), the trial court ordered two receivers to conduct the business of the furniture company after it was discovered that the existing board of directors, who were involved in numerous involuntary bankruptcy proceedings and other litigation, presented an imminent danger to the company and its remaining

When individuals create a business entity under the General Corporation Laws of Maryland (Title 2 and Title 3 of the Corporations and Associations Article), they subject themselves to numerous statutory limitations, obligations, and requirements. The individuals must first choose a general corporation as their business entity. After selecting that form of entity, the individuals must file Articles of Incorporation and create corporate by-laws to govern the shareholders, board of directors, and corporate officers who manage the corporation. Incident to this is also the agreement between the individuals (as a group) and the corporation that the individuals will restrict their acts within the confines of that corporate structure. If performed in accordance with the statutory requirements found in Title 1 and Title 2 of the Corporations and Associations Article, the general corporation is created. The statutes do more than merely allow a general corporation to be formed; they oversee the administration and organization of the corporation, and provide for the ultimate demise of the corporation, if necessary. Because one benefit of a corporation is that it may have a perpetual life, the demise of a corporation is regulated as an extraordinary action under

---

shareholders. No express holding of insolvency was made. The receivers were authorized by the court to borrow $10,000 in an attempt to maintain the business as a going concern. *Id.* After failing in that effort, the trial court authorized the receivers, who represented the owners or substantial owners of 76 of the 90 shares of stock of the company (50 of the 76 shares represented by the receivers were pledged by the ousted directors without transferring the voting rights attendant with those shares), to sell the company's assets to satisfy the loan and benefit all remaining creditors and stockholders. Citing *Mason v. Hubner,* 104 Md. 554, 556–57, 65 A. 367 (1906) (court appointed receiver authorized to sell the assets of an insolvent company to protect the interests of the shareholders and creditors), we explained that the court had the authority to sell the assets of the company to "protect the interests of all parties concerned." *Id.* at 581, 149 A. at 560. We explained that the court was "bound to protect the honor of the court" during the Great Depression Era, and that the only means for satisfying the $10,000 loan was a sale of property. *Id.* at 583, 149 A. at 561. While the Court may have blessed this particular exercise of a trial court's equity powers of receivership, it seems, with the benefit of hindsight, that that exercise led to an impermissible involuntary dissolution because the receivers did not hold sufficient voting power to dissolve voluntarily the furniture company.

Title 3 of the Article. The manner of corporate demise that is at issue in this case is involuntary, or judicial, dissolution.

Our current involuntary dissolution statute has remained unchanged in substance since its inception as Chapter 649 of the 1967 Laws of Maryland. First codified as § 79A of Article 23, it was later re-enacted as §§ 3–413 and 3–414 of the Corporations and Associations Article of the Maryland Code, 1975 Md. Laws, Chap. 311. The parties in this case argue that their dispute hinges on the exact meaning and application of, "the directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained, . . ." The situation described in § 3–413(a)(1) is commonly referred to as deadlock. A deadlocked corporation was defined, prior to enactment of § 79A, as "one which, because of decision or indecision of the stockholders cannot perform its corporate powers." *Murray v. Requardt*, 180 Md. 245, 253, 23 A.2d 697, 700 (1942).[18] Because the critical phrase "the management of the corporation's affairs" is undefined and vague, we look to the legislative history in aid of our inquiry regarding this issue.

The Final Report of the Commission on Revision of the Corporation Laws of Maryland (the "Commission"), dated 15 December 1966, sheds some light on the meaning of these terms. It states, in relevant part, that,

> The Commission is of the opinion that Section 52(e) [of Article 23] is inadequate to deal with situations of deadlock, serious dissention and the like. The Commission studied the current provisions of the Model Act and statutes of

---

**18.** In *Murray*, we overturned an injunction granted by an equity court that prevented a majority shareholder, acting in her capacity as President and with the approval of the majority of the board of directors, from reducing Mr. Requardt's position from Vice–President ($140 salary per week) to Chairman of the Board ($50 salary per week). *Murray* reviewed a court's inherent equity powers in crafting the injunction and not an exercise of statutory authority for involuntary dissolution (indeed, the trial court denied Mr. Requardt's petition for dissolution). In the present case, we assertedly have a division among the directors, not the shareholders. Despite these differences, we find the holding in *Murray* instructive, as we shall discuss, *infra* IV. B.

states which have enacted substantially that Act, as well as the statutes of some other states such as New York. The proposal draws principally on the current Model [Business Corporation] Act and the current provisions of the New York law, but differs in some respects. It seeks to draw an adequate line between situations in which dissolution is the only practical solution while retaining the proper concept of permanence of the corporate entity and a policy against requiring courts to arbitrate personal disputes about policy or management of the business enterprise.

While it appears that other state statutes were consulted in the compilation of the Report, the Commission credited the Model Business Corporation Act (the "Model Act") and the New York corporation statute with significantly greater weight in its analysis. Section 3–413 is more similar to the New York provision, which states that holders of 50% or more of the outstanding shares entitled to vote in an election for directors may petition for dissolution if "the directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained." N.Y. Business Corporation Law § 1104(a) (McKinney 1963), *cited in* Hornstein, *supra,* at 166 (1968 Supp.).[19] The relevant portion of the Model Act extant at the time of the Commission Report was much less similar to the Maryland statute than was the New York statute.[20]

---

**19.** The current version, § 1104(a)(1), retains the identical language found in § 3–413(a) of the Maryland Corporations and Associations Article.

**20.** Section 97 of the 1969 Model Act, is the same as § 90 in effect from the 1960 Act (amended in 1966). 3 *Model Business Corporation Act Annotated,* 101 (Willard P. Scott ed., 2nd ed., 1971). It reads, in relevant part:

The ——— courts shall have full power to liquidate the assets and business of a corporation:

(a) In an action by a shareholder when it is established:

(1) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof:

Despite the similarities between the Maryland statute and the New York statute and, to a lesser extent, the Model Act, the Commission intended the Maryland act to operate differently than either of them. The intent is apparent in the Maryland scheme to afford the corporate entity statutory protection from internal and non-substantive personal quarrels regarding the management of the business.

Because the record of the present case revealed only two possible grounds advanced for dissolution of Custom, we shall limit our inquiry to the asserted lack of approval of dividends and the failure to agree on corporate counsel for Custom.

## A.

### Dividend Distribution

Barry argues that the similarity of the Maryland statute with the New York statute should influence a conclusion that before dissolution is ordered the directors must be so divided on "matters material and essential to the existence of the corporation." He cites *Wollman v. Littman*, 35 A.D.2d 935, 316 N.Y.S.2d 526 (N.Y.App.Div.1970) and *In re Admiral Rubber Corporation*, 12 Misc.2d 355, 172 N.Y.S.2d 952 (N.Y.Sup. Ct.1958).[21] His argument follows that the distribution of

---

2 *Model Business Corporation Act Annotated*, § 97 at 552-53 (Willard P. Scott ed., 2nd ed., 1971); *Corporate Dissolution for Illegal, Oppressive or Fraudulent Acts: The Maryland Solution*, 28 Md. L.Rev. 360, 360 (1968). We note that our reference to the applicable section of the Model Act in *Turner v. Flynn & Emrich Company of Baltimore City*, 269 Md. 407, 409-10, 306 A.2d 218, 219 (1973) (interpreting § 79A (b) of Article 23), incorrectly refers to § 97 of the 1960 Model Act.

The editors of the Annotated Model Act did not consider § 79A of Article 23 of the Maryland Code to be either identical, identical in substance, or even similar to the Model Act. It is referred to, without elaboration, simply as an "other statutory provision" for resolving director deadlock. 2 *Model Act Annotated, supra*, at 558.

21. Barry also cites to James J. Hanks, *Maryland Corporation Law*, which states, without citing to authority, the following:

A director deadlock does not arise simply because the directors are unable to take action on a particular matter. The deadlock must materially and adversely affect the ability of the board to perform its

dividends is not a material matter essential to the existence of the corporation, but rather a matter of importance only to the shareholders. Because the distribution of dividends is of no consequence to the daily operation of the corporation, it is an insufficient ground upon which to order involuntary dissolution. *In re Smith,* 154 A.D.2d 537, 546 N.Y.S.2d 382, 384 (N.Y.App.Div.1989) (holding that the failure to declare dividends by a close corporation without a policy of declaring dividends is insufficient to order involuntary dissolution under a claim for stockholder oppression); *Hall v. John S. Isaacs & Sons Farms, Inc.,* 163 A.2d 288, 295 (Del.1960) (stating that "the refusal to declare dividends seems not to be ground for the appointment of liquidating receivers"). He argues in the alternative that a refusal to distribute dividends is not a deadlock, but rather the equivalent of a decision by the board not to issue dividends.

Forman, supporting Barry's conclusion, but in a different manner, relies on the language of § 3–413 to frame a contention more in tune with our refusal to consider judicial dissolution outside of specific statutory authority. In Forman's view, regardless of the extent of conflict and its impact on the corporation, the conflict must exist in the *present,* that is at the time of the dispositive evidentiary hearing. He states that nowhere in the record is there any finding by the trial judge of a deadlock over dividends. Furthermore, because Barry capitulated ultimately to the unrestricted dividend distribution (albeit at the proverbial eleventh hour), there was no conflict over dividends. He is correct.

 Whatever ambiguity may exist as to what may be considered corporate deadlock under § 3–413, the statutory language is at least clear that a conflict of some order must exist. The statute contemplates that "the directors *are so divided* . . ." so that "votes required for action by the board cannot be obtained." § 3–413(a)(1). Past conflict is irrelevant

duties under Section 2–401 to direct the management of the corporation's business and affairs.

§ 11.7[a] at 357–58 (1992, Supp.1997).

and consideration of future conflict, however prescient, is not contemplated by the statute. The requirement of a current conflict reflects the intent of the statute to avoid judicial intervention regarding personal disputes by allowing the parties the opportunity to resolve their disputes before the entry of judgment. *See* Commission, *supra*, at 73.

Michael disagrees and would craft a separate standard for dealing with holding corporations like Custom, organized under the General Corporations Title of the Corporations and Associations Article. Michael argues that § 3–413(a)(1) contemplates that a deadlock of sufficient magnitude could exist in a holding corporation over dividend distributions so as to authorize a court to exercise its discretion to order dissolution. He relies (incorrectly) on the Court of Special Appeals's opinion here, (which described erroneously the Circuit Court's 4 November 2003 opinion as based on a deadlock over dividends) which stated "[i]t is obvious that the deadlock over the payment of dividends completely negated the primary reason for the corporation's existence." The Circuit Court, however, ordered dissolution based on the stipulated deadlock over the choice of counsel, not over dividends. Michael further argues that the deadlock required pursuant to § 3–413(a)(1) need not last for a defined period of time. He cites the Model Act as authority, which states "[d]issolution because of deadlock at the director's level is not dependent on the lapse of time during which the deadlock continues." 3 *Model Bus. Corp. Act Annotated,* § 14–104 (3rd Ed.2000/01/02 Supp.). He suggested at oral argument that this pertains to both the duration of the division as well as the currency of that division. Any reliance on the current version of the Model Act is misguided because the lapse of time referred to there alludes to the duration of the division and not whether the division presently exists or merely existed in the past.

Whatever the nature and magnitude of the corporate conflict required to grant involuntary dissolution under § 3–413, it is a moot point here in regard to the question of distributing dividends. When the Class B Directors capitulat-

ed and signed the Proposed Director Consent Form, without any conditions, on or about 18 September 2003 and before the Circuit Court received the additional evidence and entered a new judgment, there was no longer any division among the directors regarding dividends. The Class M Directors had proposed a $4 million dividend and the Class B Directors accepted the proposal. There was no evidence in the record nor any judicial holding that the executed Proposed Director Consent Form was either a sham or made in bad faith. To allow a court to exercise its equity powers to grant involuntary dissolution of a corporation on the basis that the directors were divided as to dividends, where the moving party received exactly what it sought, would have been an abuse of discretion.[22]

## B.

### Corporate Counsel

Barry placed this issue squarely in this case when he stated at the 22 September 2003 hearing that he took "great issue with the fact that Shale Stiller is general counsel of Custom,

---

**22.** While we do not decide the question of whether a deadlock over the distribution of dividends is a corporate inaction sufficient under § 3–413(a)(1) to order dissolution of a general corporation, we would be loathe in any event to create a special rule to deal with a "type" of general corporation (as Michael asks) because dividends are the alleged sole purpose for such a holding corporation. Statutory authority for dealing with special "types" of business entities of this ilk already exist in Title 4 (Close Corporations) and Title 4A (Limited Liability Company Act). In any case, the decision to distribute dividends is a discretionary act by the board of directors in most cases and may be subject to review under the business judgment rule. *Gabelli & Co.v. Liggett Group, Inc.*, 479 A.2d 276, 280 (Del.1984); *see* Md.Code (1975, 1999 Repl.Vol., 2004 Supp.) §§ 2–309, 2–311, 2–405.1 of the Corporations and Associations Article; James J. Hanks, *Maryland Corporation Law*, § 5.10 (1992, Supp.1997) (observing that a director, in deciding whether to authorize a dividend distribution, acts in accordance with § 2–405.1(a) of the Corporations and Associations Article, he or she will not have personal liability); *see also*, Hanks, *supra*, § 5.7 (observing that one of the "fundamental issues" of corporation law is the "corporation's right" to pay (or not pay) dividends).

and if the court can construe that as a deadlock issue, we will concede that issue."

Although Barry presented the issue of the alleged director deadlock regarding the selection of corporate counsel in his petition for certiorari, inexplicably, he did not dedicate any portion of his petitioner's brief to that issue. Thus, we are left to presume that, if the distribution of dividends was a discretionary act and not a matter essential to the existence of the corporation (and of greater importance than the appointment of general counsel), the appointment of general counsel, where such an appointment was also a discretionary act of the board of directors, was not a matter essential to the existence of the corporation. We turn now, with this in mind, to Barry's analysis of *Wollman* and *In re Admiral Rubber Corporation* as it may bear on this issue.

In *Wollman*, the trial court ordered dissolution of Chevreau, Ltd., a corporation whose stock was held, 50% each, by two distinct parties, the Nierenberg sisters and the Littmans. *Wollman*, 316 N.Y.S.2d at 527. The Littman faction had sued the Louis Nierenberg Corporation (also owned by the Nierenberg sisters) and the Nierenberg sisters for seeking to lure away Chevreau's customers. In response, the Nierenbergs petitioned for dissolution of Chevreau and alleged that the "corporate management is at such odds among themselves that effective management is impossible." Rather than grant the Nierenbergs' dissolution request and leave them the ultimate victor in the Littmans' lawsuit, the Appellate Division of the Supreme Court reversed the order and remanded for further findings, stating that "[i]rreconciable differences even among an evenly divided board of directors do not in all cases mandate dissolution." *Id.* The one page opinion stated that the court did not agree that the division made effective management impossible, but failed to indicate whether the petition for dissolution was brought under § 1104(a) of the New York Business Corporation Law or a common law remedy available under the equity powers of the courts of New York.

*Admiral Rubber* decided that involuntary dissolution was inappropriate and should be granted "when competing interests are so discordant as to prevent efficient management and the object of corporate existence unobtainable." *Admiral,* 172 N.Y.S.2d at 954. The manufacturing corporation in *Admiral* ceased its manufacturing functions and became "no more than a holding company," although the holding company was solvent and the "corporate objectives, assets, functions, and creditors . . ." were not in jeopardy. *Id.* One factor in the decision was a section of the New York law, § 117 of the General Corporation Law, that dissolution must be beneficial to the stockholders.[23]

Forman argues that the deadlock over the selection of corporate counsel was an insufficient ground upon which to justify involuntary dissolution. Custom has no purpose other than to manage marketable securities obtained with the proceeds from the sale of Custom Savings, which management Custom outsources to Vanguard based on historically unanimous director approval. He notes that the appointment and function of corporate counsel is permissive in Custom's by-laws and, until the current litigation, Custom engaged in no litigation as plaintiff or defendant.

Michael argues that § 3–413(a)(1) does not require a finding of deadlock but merely a division, arguably a lesser standard. A "division" does not require a court to find "irreparable harm" to the corporation (similar to the Model Act). A division also would not require a finding that the conflict impacts or otherwise materially affects the daily operation of the corporation.

---

**23.** Section 117 at the time stated "if it shall appear . . . that a dissolution will be beneficial to the stockholders and not injurious to the public, the court must make a final order dissolving the corporation . . ." Current § 1111, in effect at the time § 79A was enacted in Maryland, granted courts the discretion to order dissolution of corporations, while solvent, if the dissolution could be ordered to "insure fairness to all shareholders." Historical Comment to N.Y. Business Corporation Law § 1111 (McKinney 2003).

Michael further argues that even if deadlock were required, the Maryland statute grants the trial court significant discretion to consider the fairness to all shareholders in an involuntary dissolution. Such a provision explicitly appears in the New York Business Corporation Law, § 1111, he points out, and, because the Maryland General Assembly relied upon the Commission Report which probably relied upon the New York statute in crafting its involuntary dissolution statute, should be engrafted upon our interpretation of § 3–413(a)(1). Michael links the conflict over corporate counsel to the brothers' inability to access the income from, and / or the corpus of, the proceeds of the sale of their former business, Custom Savings, without the distribution of dividends. Michael reasons that Barry's obstruction prevented them from reaching an agreement for the distribution of dividends. Thus, dissolution and distribution of the net assets of Custom would benefit the shareholders by delivering the proceeds from the sale of Custom Savings to its shareholders.

 We reiterate that § 3–413(a)(1) allows a shareholder to petition for involuntary dissolution when the "directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained." In addition to a requirement of a present conflict, three other prerequisites are apparent from the statutory language. First, a formal vote is not necessary, although preferred, if it is obvious from the conduct of the directors that the vote required for action "cannot be obtained." Second, the directors must be more than merely divided, otherwise the use of the word "so" becomes mere surplusage. Third, the division among the directors must go towards the management of the corporation's affairs, which is otherwise undefined.

 We hold that, in order to satisfy the meaning of "so divided" regarding the "management of the corporation's affairs," the directors must be in deadlock, not mere division. We define a deadlocked corporation under § 3–413(a)(1) in familiar terms—one which, because of decision or indecision of

the directors that cannot be remedied by the shareholders, the corporation cannot perform its corporate powers. *See Murray v. Requardt*, 180 Md. 245, 253, 23 A.2d 697, 700 (1942).[24] This modified-*Murray* standard addresses the issue of deadlock in a manner contemplated by § 3–413(a)(1) where the directors, and not the shareholders, are the modality in deadlock.

Mere division between the directors is an insufficient basis upon which to order dissolution. It is clear that originally § 79A was enacted to craft a statutory remedy for divided corporations to permit a court to dissolve a corporation only in those instances where such a dissolution did not run contrary to the established public policy of "permanence of the corporate entity." It is also evident that the statute sought to prevent courts from "arbitrat[ing] personal disputes about policy or management of the business enterprise." Commission, *supra*, at 73. Prior to the enactment of § 79A, involuntary dissolution or receivership could be obtained through either repeated shareholder deadlock over the election of directors or insolvency. Md.Code (1957, 1966 Repl. Vol.) Art. 23 §§ 52(e), 80. A division standard incorrectly would permit a shareholder to petition for involuntary dissolution over a mere dissension among the board of directors and would embolden shareholders to seek involuntary dissolution over personal disputes among the directors, shareholders, or both. James J. Hanks, *Maryland Corporation Law*, § 11.7[a] (1992, Supp.1997) ("Intra-board disputes or differences of opinion are not alone sufficient to justify involuntary dissolution on the ground of deadlock.") (citing *Du Puy v. Transportation & Terminal Co.*, 82 Md. 408, 426, 33 A. 889, 890 (1896) (holding that court will not exercise its equity powers in a shareholder

24. When the required vote by the shareholders cannot be obtained to resolve the deadlock (or order voluntary dissolution), whether the voting standard is by statute, the Articles of Incorporation, or by corporate by-laws, the only alternative method of resolving the deadlock may be involuntary dissolution. Harry G. Henn & John R. Alexander, *Laws of Corporations & Other Business Enterprises*, § 280 at 751 (3rd ed.1983)

petition for receivership for "differences or disputes" between management)); *see Hornstein, supra,* § 820 at 363 (observing that dissension usually reaches the stage of deadlock when "both the directors and the shareholders are evenly divided . . ." and "neither side being authorized or having the majority vote to impose its views upon the other").

When the General Assembly enacted § 79A, it was obvious from the language of the Commission report that the intent of the Act was not to supplant the entire body of Maryland corporate law jurisprudence, albeit sparse at the time, with a mere dissension standard for dissolution. Rather, § 79A was designed to address issues of deadlock. When dissension is serious enough to reach the stage of deadlock, then a court has the discretion to order dissolution based on an appropriate evidentiary showing pursuant to § 3–413(a)(1). *See Hornstein, supra,* at 363.

▪▪ Michael also is incorrect to read into § 3–413(a)(1) a requirement that the trial judge consider the benefit to all shareholders, as found in the New York Business Corporation Law at the time § 79A was enacted. Such a standard, were it appropriate, would have been adopted expressly by the General Assembly. The absence of any language similar to § 1111 of the New York Business Corporation Law in the Maryland General Corporate Law reflects a rejection of the "benefit to the shareholders" standard.

Only one term remains undefined in our statute that goes directly to the question of the management of the corporation's affairs—corporate powers. To be consistent with the intent of the statute, "corporate powers" cannot mean any and all powers of the corporation. Such an understanding would result in the non-sensical fostering of involuntary dissolution petitions in the case of trivial dissensions over the use of corporate powers, or even a dispute about the day-to-day operations of the corporation, an issue best resolved by the corporate officers, not the directors (which, in this case, would involve the same people). Useful factors to determine what exactly a corporate power envisioned by the statute include:

(a) whether the corporate function(s) have ceased; (b) the power in dispute is expressed as a discretionary or mandatory power in the corporation's Articles of Incorporation, by-laws, or other corporate governing documents; (c) the role of that power in achieving the corporation's primary function(s); and, (d) whether the corporation has exercised, as a matter of practice, that power routinely in its operations. *See Murray,* 180 Md. at 253, 23 A.2d at 700; *Admiral Rubber,* 172 N.Y.S.2d at 954 (holding that dissolution should be granted only when the efficient management of the corporation is at risk and the "object of corporate existence unobtainable.").

 Evaluating the dispute over corporate counsel for Custom in light of the foregoing, we conclude that this dispute, on this record, is insufficient to justify an order of dissolution. It is clear from this record that the issue of corporate counsel had little impact, if any, on Custom's transcendent corporate function, managing the investment securities obtained as proceeds from the sale of Custom Savings. The directors agreed to the selection of a management/investment advisor and the allocation of assets. They conducted a teleconference with the advisor during these proceedings, even while Barry obstinately refused to recognize Shale Stiller as Custom's corporate counsel. The governing documents for Custom show that the officers and directors have a duty to consult with counsel only if one has been appointed. This duty naturally is dependent on there being an appointed counsel. In fact, the by-laws provide that the board of directors *may* appoint counsel in its discretion.

As Forman points out, there has been no occasion since Custom's inception to sue or defend itself against suit until the present dispute. Although corporate counsel in the abstract has greater value then simply as a litigation facilitator, Forman's well-taken point is that Custom's need for legal advice would, and did, not impact necessarily its ability to fulfill its main corporate function of managing investment securities.

Even though the board of directors of Custom may have been divided as to the choice of corporate counsel, that

division does not rise to the level of deadlock required by § 3–413(a)(1). The trial court did not have the discretion contemplated by the statute to order dissolution for that reason.

## V.

We turn finally to Barry's contention that the appointment of Forman as counsel for Custom was prejudicial error because a corporation has a legal right to select its own counsel.[25] Barry is incorrect.

Barry cites *Tydings v. Berk Enterprises*, 80 Md.App. 634, 565 A.2d 390 (1989), claiming that a court has no apparent or actual authority to appoint counsel for a corporation. *Tydings*, where the Court of Special Appeals vacated an order appointing counsel for a corporation, is distinguishable from the present case. In *Tydings*, the minority shareholder, Berk Enterprises, brought suit against Montgomery Golf Corporation and the majority shareholders, the Tydings family. Because counsel for the Tydings family also was counsel for Montgomery Golf, the trial judge requested that the shareholders submit a list of mutually agreeable names to serve as counsel for the corporation. Berk nominated one lawyer. The Tydings family nominated no one. As a result, the court

---

**25.** Of course, Custom was required to have counsel if its interests were to be represented in this litigation. *See* Md. Rule 2–131(a)(2) ("a person other than an individual may enter an appearance only by an attorney."); Md.Code (1989, 2004 Repl.Vol.), § 10–206(b)(4) of the Business Occupations and Associations Article (permitting, as an exception to the general rule requiring a Maryland attorney to enter an appearance on behalf of a corporation specific officers and employees to enter an appearance on behalf of a corporation only in a civil action in the District Court of Maryland for a small claim action); *First Wholesale Cleaners, Inc. v. Donegal Mutual Ins. Co.*, 143 Md.App. 24, 30–33, 792 A.2d 325, 329–30 (2002) (summarizing that §§ 10–206(b), 10–601 of the Business Occupations and Professions Article, and Maryland Rule 2–131(a)(2) generally prohibits a corporation from entering its appearance by a non-lawyer); Paul V. Niemeyer, et al., *Maryland Rules Commentary*, 126 (3rd ed.2003) (observing that "entities like ... corporations ... act only through agents, an agent who enters an appearance on behalf of one of these entities must be an attorney.").

No one contends, nor could they, that Custom does not have an interest in whether it is dissolved involuntarily.

appointed Berk's nominee as counsel although no formal order to that effect was entered. In the meantime, the board of directors, controlled by the Tydings family, appointed counsel for the corporation. The counsel appointed by board action attempted to enter his appearance at a later hearing only to be refused by the trial judge. *Id.* at 638, 565 A.2d at 392. The Court of Special Appeals overturned the trial court's decision, holding that the choice of independent counsel must be left to the board of directors. *Id.* at 645, 565 A.2d at 396. Because the board of directors' action was supported by a sufficient majority, the trial court lacked the authority to appoint counsel in the absence of a deadlock.

In this case, Custom's board of directors had an opportunity to select a mutually agreeable attorney as counsel for the proceedings, but could not. It is irrelevant that Barry thought that he was the best attorney to defend Custom; the decision on who should represent the corporation's interests rested in the board of directors as a whole in the first instance. Because of the board's inability to select counsel for these proceedings, the Circuit Court did not err in appointing counsel for Custom.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE CIRCUIT COURT FOR BALTIMORE COUNTY'S ORDER FOR INVOLUNTARY DISSOLUTION OF CUSTOM HOLDING, INCORPORATED. COSTS TO BE PAID ONE–HALF BY RESPONDENT MICHAEL RENBAUM AND ONE–HALF BY PETITIONER BARRY RENBAUM.*