887 A.2d 525

**Crystal A. BENSON, et al.**

v.

**STATE of Maryland, et al.**

**No. 7, Sept. Term, 2005.**

Court of Appeals of Maryland.

Dec. 7, 2005.

618

Marshall N. Perkins (Charles J. Piven of Law Offices of Charles J. Piven, P.A., Baltimore; Roger R. Munn, Jr., of the Law Offices of Carl R. Gold, Towson), all on brief, for appellants.

Debra Gardner, John Kopolow, Public Justice Center, Baltimore, brief of Amici Curiae Alternative Directions, Inc., Children Having Incarcerated Parents, Inc., Citizens United for the Rehabilitation of Errants, Family and Corrections Network, Maryland Justice Coalition, Maryland Justice Policy Institute, Inc., and Public Justice Center.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Baltimore), on brief, for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We issued a writ of certiorari to the Court of Special Appeals, before it decided the appeal in this case, to consider several questions:

1. Whether the State of Maryland violates Articles 8 and/or 14 of the Declaration of Rights or the Maryland Consumer Protection Act (CPA), or is subject to the common law actions of unjust enrichment or for money had and received, when the State receives a commission on charges collected from collect phone calls made by prison inmates where the authorizing statute fails to establish the specific rate of commission to be remitted to the State.

2. Whether the notice provisions of the Maryland Tort Claims Act (MTCA) are satisfied when a claimant: (a)

brings an action on behalf of a class of plaintiffs; (b) fails to state the specific amount of damages sought, yet the Office of the State Treasurer (Treasurer) could possibly ascertain the amount of damages by investigation; and, (c) files a claim in court seeking injunctive relief one month after giving notice of the claim to the Treasurer when the claim submitted to the Treasurer sought damages only.

3. Whether the Circuit Court erred in denying post-judgment motions seeking permission to advance additional allegations beyond those asserted in Appellants' last amended class action complaints.

## I.

## A.

### *Background*

Prison inmates who satisfy the security requirements of their respective correctional facilities are permitted to make non-emergency telephone calls, but only on a collect call basis.[1] Code of Maryland Regulations (COMAR) § 12.02.14.01(C)(2). The State Department of Budget and Management (DBM), with the approval of the Board of Public Works, contracted with two private companies to install, maintain, and service telephones and monitoring equipment in the State's correctional facilities. The customer rates for these calls, which are paid by the persons accepting the collect calls placed by the inmate, are set under the contracts. At the operative times in the present litigation, the contract rates were as follows: a flat charge of $0.85 for local calls; $3.45 for the first minute, plus $0.45 for each additional minute, for intra-state long distance calls; and $4.84 for the first minute, plus $0.89 for each additional minute, for inter-state long distance calls. The telephone companies collected the charges from the parties

---

1. In instances of emergency, the inmate is allowed to use an institutional telephone without charge. Code of Maryland Regulations (COMAR) 12.02.14.01(C)(1).

receiving and accepting the calls, and then remitted the commissions to the State (a fixed percentage of the total telephone fees charged per call). The telephone commission rates were 20% of local call charges and 42% of long distance call charges.[2] Between Fiscal Year (FY) 1999 and FY 2002, the State received between $5.6 million and $7.3 million each year from the telephone commissions.

Pursuant to §§ 10–502 and 10–503(a)(2) of the Correctional Services Article of the Maryland Code,[3] the State's commissions are paid into the State Treasury to be used for an Inmate Welfare Fund (Fund), with each correctional facility having its own dedicated fund to provide goods and services

---

2. In 2003, the customer rates and the telephone commission percentages were changed by contract and currently are as follows: for local calls, a flat charge of $0.85 per call unless the inmate used the debit/prepaid program or a flat charge of $0.50 if the debit/prepaid program was used; for intra-state long distance calls, a charge of $2.85 for the first minute, plus $0.30 for each additional minute, absent the debit/prepaid program, or a charge of $0.30 for the first minute, plus $0.30 for each additional minute, with the debit/prepaid program; for inter-state long distance, a charge of $3.00 for the first minute, plus $0.30 for each additional minute, without using the debit/prepaid program or a charge of $0.30 for the first minute, plus $0.30 for each additional minute, using the debit/prepaid program. The current commission rates remitted to the State are 48% of charges for local calls and 57.5% of charges for long distance calls made without use of the debit/prepaid program and 60% of charges for both local and long distance calls made using the debit/prepaid program.

3. Section 10–502 provides:

(a) *Established.*—There is an inmate welfare fund in each State correctional facility.
(b) *Uses.*—A fund may be used only for goods and services that benefit the general inmate population as defined by regulations that the Department [of Public Safety and Correctional Services] adopts. Section 10–503(a)(2) provides, in pertinent part:
(i) Each fund consists of:
 1. profits derived from the sale of goods through the commissary operation and telephone and vending machine commissions; and
 2. subject to subparagraph (ii) of this paragraph, money received from other sources.
(ii) Money from the General Fund of the Sate may not be transferred by budget amendment or otherwise to a fund.

that benefit the general inmate population of that facility.[1] The State Treasurer must hold separately, and the Comptroller account for, each fund. § 10–503(a)(3). Furthermore, each facility's fund is subject to an audit by the Office of Legislative Audits, pursuant to § 10–503(a)(4). Under § 10–504, the Comptroller pays out money from each fund as authorized in the approved State Budget for each fiscal year.

## B.

### *The Present Case*

Sandra Benson and Mary Ann Dean, Appellants, received and accepted collect calls from inmate relatives during the periods 2 February 2001 through 9 February 2001 and 21 November 1998 through 6 April 2002, respectively, and paid the resulting bills calculated according to the rate structure outlined *supra*, including the State's commission. On 25 October 2001, Benson, purporting to act on behalf of herself and others similarly situated, sent a letter by certified mail to the Treasurer, pursuant to the MTCA, complaining about the "anti-competitive" collect telephone call contract and fee "mandated" as a commission. She sought compensatory damages, punitive damages, and attorneys' fees.[5]

When the relief Benson sought was not forthcoming immediately, she filed a Class Action Complaint on 26 November 2001 in the Circuit Court for Baltimore City. Several amended complaints followed, consummated by her Fifth Amended Class Action Complaint on 19 May 2003. She alleged that the commission remitted to the State was illegal under nine causes

---

Unless otherwise provided or as context may dictate to the contrary, all statutory references are to sections within Maryland Code (1999), Correctional Services Article.

4. The Inmate Welfare Fund is used to pay for some inmate medical care, religious and educational services, family day activities, recreational activities, and other costs associated with indigent inmates, such as clothing and postage.

5. Dean, on 28 May 2002, sent to the Treasurer a similar letter regarding her claims.

of action, as both direct causes of action and actions filed under the MTCA. The various theories of recovery were based on asserted violations of: the Maryland Declaration of Rights, Article 8 (separation of powers); Maryland Declaration of Rights, Article 14 (Legislature's consent required to rate or levy an aid, charge, fee, tax or burthen); Maryland Antitrust Act; Maryland Consumer Protection Act; Maryland Constitution, Article III, § 32 (appropriations); Maryland Declaration of Rights, Article 24 (unlawful taking); unjust enrichment; common law action for money had and received; and, civil conspiracy. For each count, Benson sought prospective injunctive relief to enjoin the State from charging, billing, invoicing, and collecting the commission; an award for attorneys' fees, litigation costs, and interest; and compensatory and punitive damages for herself and each class member. Dean filed her virtually identical Class Action Complaint on 12 June 2003 in the Circuit Court of Baltimore City.

On 24 July 2003, the State filed in each case an omnibus motion to dismiss for failure to state a claim upon which relief may be granted, and also asserted that all claims were barred by the MTCA. The State appended exhibits to its motion and, months later, filed an affidavit in further support of its contentions.

The Circuit Court dismissed all of Benson's and Dean's claims in a single order entered on 25 June 2004, nearly a year after the State filed its motion to dismiss. As to Benson's tort-based claims, the court dismissed them for non-compliance with the requirements of the MTCA. The court found that the MTCA did not authorize class action suits. The court also rejected Appellants' prayers for punitive damages as not permitted by the MTCA. In addition, the trial judge concluded that Benson brought her complaint prematurely because she filed it only one month after submitting her claim letter to the Treasurer and without awaiting a reply. The court opined that, because she sought monetary relief, Benson should have waited the sooner of either receiving the Treasurer's denial of relief or six months from the time of filing her claim with the Treasurer. Thus, having resolved that Benson failed to re-

ceive a final denial from the Treasurer before she filed her complaint, maintenance of her tort claims was precluded.

Benson's non-tort claims under the Consumer Protection Act and the antitrust statute also were dismissed. The court dismissed the Consumer Protection Act claim because it concluded that the State was protected by sovereign immunity, the remittance of the telephone commission was not an unfair trade practice, and Appellants suffered no actual loss because they would have paid the same amounts to the private telephone companies even had no commission been remitted to the State. The court dismissed the antitrust claim on sovereign immunity grounds because the State was acting within its legal authority to require the remittance of the telephone commission from the private telephone companies, and because the court was not the appropriate body to decide whether the approved telephone call rates and commission were excessive.

The court dismissed all of Dean's claims as well. The court specifically found that Dean failed to give the State timely notice of her claimed injuries, which began in 1999, because her letter to the Treasurer was not sent until 2003. Thus, Dean's tort claims were precluded for failure to comply with the MTCA's notice provisions. The court also dismissed all of Dean's claims because she failed to allege in her complaint any facts supporting her claimed injury, concluding that the appended exhibits of her phone bills were insufficient to establish loss.

On 2 July 2004, Benson and Dean filed a joint Motion to Alter or Amend Judgment seeking to add several allegations to their complaints, including that each of the plaintiffs "suffered actual injury related to the matters complained of." Soon thereafter, Benson and Dean filed notices of appeal to the Court of Special Appeals. They then filed a second post-judgment motion with the Circuit Court on 13 September 2004 seeking to amend their complaints to add allegations that the violations were continuing. They argued that the court failed to recognize that Benson's initial complaint sought only injunctive relief and therefore she complied with MTCA require-

ments. The Circuit Court denied the post-judgment motions. We issued a writ of certiorari before the Court of Special Appeals could decide the appeals, *Benson v. State,* 386 Md. 180, 872 A.2d 46 (2005).

## II.

### *Standard of Review*

We treat the motion granted in this case as a true motion to dismiss for failure to state a claim upon which relief may be granted because the trial court expressly limited its consideration to the factual allegations of the complaints and ignored the additional factual considerations tendered in the exhibits and affidavit submitted by the State in support of its motion to dismiss. *See* Md. Rule 2–322(c) (providing that if, in a motion to dismiss for failure to state a cause of action upon which relief may be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501").

When reviewing the grant of a motion to dismiss for failure to state a claim upon which relief may be granted, we "assume the truth of all well-pleaded, relevant, and material facts in the complaint and any reasonable inferences that can be drawn therefrom." *Muthukumarana v. Montgomery County,* 370 Md. 447, 474, 805 A.2d 372, 388 (2002) (quoting *Allied Invest. Corp. v. Jasen,* 354 Md. 547, 555, 731 A.2d 957, 961 (1999)). "Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *Jasen,* 354 Md. at 555, 731 A.2d at 961. Therefore, on appeal, this court determines whether the trial court was legally correct in granting the motion to dismiss.

We also must determine whether the Circuit Court abused its discretion in denying Benson's and Dean's motions to alter or amend the judgment. *Renbaum v. Custom Holding, Inc.,* 386 Md. 28, 42–43, 871 A.2d 554, 563 (2005).

## III.

### *Articles 14 and 8 of the Declaration of Rights*

Appellants claim that the collection and remittance of the telephone commission to the State violates Article 14 (no aid, tax, charge, fee or burthen shall be rated or levied without consent of the Legislature) and Article 8 (separation of powers) of the Maryland Declaration of Rights. We begin by considering whether the MTCA applies to alleged violations of Article 14 and whether a private right of action is available for an alleged violation of Article 14. If a private right of action under Article 14 may be brought, we must determine whether a plaintiff may be awarded damages for its violation, if proven. Thereafter, we shall construe Articles 14 and 8 to determine whether the imposition of the telephone commission is illegal as pleaded. These questions have not been directly raised or decided previously in a reported Maryland case.[6]

### A.

### *Applicability of the Maryland Tort Claims Act*

■ The Circuit Court concluded that the MTCA's procedural requirements must be satisfied in order to bring suit on

---

**6.** There exist three Maryland cases where it was argued specifically that a tax or fee was levied without the consent of the Legislature in violation of Article 14. In none did the Court consider specifically whether a private right of action would lie, yet implied that it might. In *Ogrinz v. James*, the Court succinctly dismissed the Article 14 claim on its merits on the basis that the Legislature in fact consented to the "taxes" in question. 309 Md. 381, 396, 524 A.2d 77, 85 (1987) (finding that the "General Assembly clearly has imposed the tax"). In *White v. Prince George's County*, the Court did not discuss the Article 14 claim at all. 282 Md. 641, 387 A.2d 260 (1978) (implying, without stating, that the plaintiff failed to raise a successful Article 14 claim regarding a tax on deeds of trust when plaintiff sued on behalf of himself and all others similarly situated). Nor did the court discuss the Article 14 claim in *Goldsborough v. Postal Telegraph Co.*, 123 Md. 73, 91 A. 147 (1914) (concluding that the case presented did not require the Court to decide whether the State has the power to charge rent payments to a lessee). *See infra* Section (III)(D)(ii) (discussing *Goldsborough* ).

a constitutional tort claim, and found that Benson's and Dean's Article 14 claims were precluded for failure to comply with the MTCA. We hold that the MTCA does not apply to alleged violations of Article 14 of the Declaration of Rights; thus, the trial court was mistaken on this point.

In *Lee v. Cline,* 384 Md. 245, 256, 863 A.2d 297, 304 (2004), this Court held that the MTCA applied to a constitutional tort claim flowing from an asserted search and seizure violation, and extended to state personnel qualified immunity for such torts if committed within the scope of employment and without malice. We do not extend, however, our reasoning in *Lee v. Cline* so far as to require that all constitutional tort claims must comply with the requirements imposed by the MTCA. Rather, we hold that a claim for violation of Article 14 is not subject to the requirements of the MTCA because a claim under Article 14 is not compensable in monetary damages, *see infra* Section III(B).

### B.

#### *Private Right of Action Under Article 14*

■ A private right of action for violation of Article 14 may lie because it is a self-executing constitutional provision.[7] Whether a constitutional provision is "self-executing," so as to make it enforceable judicially, is an issue addressed by the U.S. Supreme Court in *Davis v. Burke,* 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249 (1900). The Supreme Court set forth the elements and characteristics of a self-executing constitutional provision:

> It supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely

---

7. The Circuit Court did not address whether a claimed cause of action for violation of Article 14 could be brought as a private right of action. Rather, the court, after dismissing the Article 14 claim for failure to comply with the requirements of the MTCA, also dismissed on the merits, implying that the court assumed that a private right of action under Article 14 could lie.

indicates principles, without laying down rules by means of which those principles may be given the force of law . . . it is self-executing only so far as it is susceptible of execution. *Davis*, 179 U.S. at 403, 21 S.Ct. at 212, 45 L.Ed. at 251 (quoting Thomas McIntyre Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union* 99 (6th ed. 1890)). When a provision is so complete, it may be enforced by the courts without the need of further legislative authority or direction. *Id.*

We applied this analysis to a claim brought under Article 15 of the Declaration of Rights. In *Leser v. Lowenstein,* 129 Md. 244, 250, 98 A. 712, 714 (1916), this Court found some of the provisions of Article 15 to be "prohibitory and self-executing, and require no act of the Legislature to make them effective." One such clause prohibited the levy of a poll tax. Another was the provision declaring that paupers ought not be assessed for the support of government. The Court also found two provisions not to be self-executing because legislation was required to give effect to the provisions: the provision declaring the method to be used to set future levies for taxes and the provision charging the General Assembly to set uniform rules providing for separate assessment of land and classifications "as it deems proper." *Leser,* 129 Md. at 250, 98 A. at 714 (quoting Article 15 of the Declaration of Rights). This Court also has determined other constitutional and statutory provisions to be self-executing. *See e.g., Casey Development Corp. v. Montgomery County,* 212 Md. 138, 150, 129 A.2d 63, 70 (1957) (finding a tax law self-executing); *Hammond v. Lancaster,* 194 Md. 462, 476, 71 A.2d 474, 480 (1950) (finding Article XVI of the Maryland Constitution (referendum power reserved to the people of Maryland) self-executing); *Harris v. State,* 194 Md. 288, 295, 71 A.2d 36, 40 (1950) (finding Article 21 of the Maryland Declaration of Rights self-executing) *overruled on other grounds, Stewart v. State,* 282 Md. 557, 386 A.2d 1206 (1978).

We conclude that Article 14 is self-executing. Article 14 of the Declaration of Rights provides that "no aid, charge, tax,

burthen or fees ought to be rated or levied, under any pretense, without the consent of the legislature." If action is taken in contravention of Article 14, then the action is voidable by a court. No further legislative action is required to effectuate Article 14. Furthermore, the provision supplies a sufficient rule by means of which the right to be free from aids, charges, taxes, burdens, and fees levied without the Legislature's consent may be enjoyed and protected. Courts may enforce Article 14 by declaring such charges invalid. Its provisions are not merely a statement of principles. It is a directive capable of execution. Also, our conclusion that its terms are self-executing is in harmony with the scheme of the Declaration of Rights, particularly when read with Article 8 (separation of powers) and Article 15 (describing some of the duties of the Legislature regarding the levy of taxes). Therefore, Benson and Dean, all other things being equal, could assert private claims under Article 14 of the Declaration of Rights.

## C.

### *Private Remedies for Violations of Article 14*

■ Having concluded that a private right action may lie based on an Article 14 violation, we must decide whether monetary damages may be awarded for its violation, if proven. The question becomes whether a common law action exists already to remedy the violation, or, if an action does not now exist, whether one should be judicially recognized. The Court has employed this common law tort analysis for constitutional claims previously, finding a right to sue for damages, but has done so only when it concluded that the constitutional provision at issue conveyed an individual right—for example, the right to be free from unreasonable searches and seizures or the right to be free from the taking of private property without just compensation. Thus, in *Widgeon v. Eastern Shore Hospital Center*, 300 Md. 520, 479 A.2d 921 (1984), we held that a plaintiff could maintain an action for damages when alleging a violation of the Articles of the Declaration of

Rights addressing searches and seizures and the deprivation of liberty, life, and property because Maryland courts historically have recognized, as an established doctrine, that "where a statute establishes an individual right, imposes a corresponding duty on the government, and fails to provide an express statutory remedy, a traditional common law action will ordinarily lie." *Widgeon*, 300 Md. at 536, 479 A.2d at 929 (Citations omitted). In *Widgeon*, we concluded that Articles 24 and 26 were intended to preserve individual liberty and property interests, respectively. *Id.*

In contrast to Articles 24 and 26, Article 14 does not secure or proclaim an individual right; rather, its terms address principles akin to those of federalism, separation of powers, and the government's authority to tax. Applying common law tort analysis to the claimed Article 14 violation to determine whether an action for damages may lie for its violation, we conclude that it does not. We also decline to create judicially a monetary damages remedy for its alleged violation. This kind of asserted constitutional violation is best corrected by declaratory or injunctive relief, not damages, because the roots of the Article 14 are not born of the common law action of trespass, like Articles 24 and 26. Although an Article 14 violation is a "constitutional tort" in the sense that it is a violation of a constitutional duty imposed upon government to refrain from levying aids, charges, taxes, burdens, or fees without the consent of the Legislature, it is not one of those individual rights for which a monetary damages remedy should be available.[8] Had Appellants not waived for appellate consideration their Article 24 due process claim asserted in the trial court, perhaps damages might be available were we to conclude that they pleaded sufficiently a claim that the telephone commission was illegal.[9] Be that as it may, we hold

---

8. In that sense, every violation of a provision of the Constitution is a tort because State government personnel are charged with the duty to uphold the Constitution and comply with its provisions. We limit *Widgeon* to provisions granting or securing individual rights.

9. Our conclusion that a claim for damages under Article 24 might lie if a violation of Article 14 is found may not serve as the basis to amend

that a private right of action may lie for an alleged violation of Article 14; but only declaratory and injunctive relief are available to remedy such a violation.

## D.

### *Did Appellants Sufficiently Plead Violations of Article 14 and Article 8?*

We now address whether the commission collected and paid to the State violates Articles 14 and/or 8. The answer naturally requires us to construe the language of the Articles.

### i.

### *Relevant Principles of Constitutional Interpretation*

 The analytical framework applied to interpret the Constitution and Declaration of Rights is quite decided and familiar. We declared in *Johns Hopkins University v. Williams*, that, "while the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee." 199 Md. 382, 386, 86 A.2d 892, 894 (1952) (Internal quotations omitted) (Citations omitted). Thus, while we may not depart from the Constitution's plain language, we are not bound strictly to accept only the meaning of the language at the time of adoption. *Cohen v. Governor of Maryland*, 255 Md. 5, 16–17, 255 A.2d 320, 325 (1969); *Boyer v. Thurston*, 247 Md. 279, 291–92, 231 A.2d 50, 57 (1967); *Buchholtz v. Hill*, 178 Md. 280, 286, 13 A.2d 348, 351 (1940) ("So it has been said that a constitution is to be interpreted by the spirit which vivifies, and not be the letter which killeth."). In addition to the plain language of Article 14, we, for the

---

Appellants' complaints yet again for two reasons. First, Appellants abandoned their Article 24 claim by not raising it in their certiorari petition. Second, we find no violation of Article 14 upon which to base a due process claim. *See infra* Section III(D)(iii).

purpose of determining the true meaning of the language used, may consider

> the mischief at which the provision was aimed, the remedy, the temper and spirit of the people at the time it was framed, the common usage well known to the people, [ ] the history of the growth or evolution of the particular provision under consideration . . . and to [the] long continued contemporaneous construction by officials charged with the administration of the government, and especially by the Legislature.

*Johns Hopkins University,* 199 Md. at 386, 86 A.2d at 894 (Internal quotation omitted). Thus, we construe the Constitution's provisions to accomplish in our modern society the purposes for which they were adopted by the drafters. *Norris v. Mayor and City Council of Baltimore,* 172 Md. 667, 192 A. 531 (1937).

ii.

*Scope of Article 14*

 We shall hold that the telephone commission in the present case is within the scope of Article 14 because it is a "charge" imposed by the State government. First, we analyze the plain language of the Article. In this process, we shall consult credible sources from both the time of adoption of Article 14 and our modern era, including PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND HELD AT THE CITY OF ANNAPOLIS, SIN *1774, 1775, & 1776* (1836); various laws enacted in 1776; and recent editions of BLACK'S LAW DICTIONARY and WEBSTER'S COLLEGIATE DICTIONARY. *See Harvey v. Marshall,* 389 Md. 243, 260–61, 884 A.2d 1171 (2005) (discussing some considerations as to the use of dictionaries, published at both the time a statute is enacted and the present time, to ascertain the meaning of statutory language).[10]

---

10. Because there does not appear to have been a formal or popular dictionary in accepted use in Maryland in the 1770's, the contemporaneous use of the pertinent language during the relevant constitutional

Article 14 lists five types of payments made by citizens to their government that cannot be rated or levied without the consent of the General Assembly: "That no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature."

An "aid" is defined as an act of helping, the help given, and also, historically, a tribute paid by a vassal to his lord. WEBSTER'S ELEVENTH NEW COLLEGIATE DICTIONARY 26 (2003).[11] A "charge" is an expense or cost. BLACK'S LAW DICTIONARY 298 (8 ed.1999); WEBSTER'S DICTIONARY at 208. The definition of "charge" has not changed since 1776 when the framers of the Maryland Declaration of Rights employed the word in adopted resolutions. *See* PROCEEDINGS OF THE CONVENTIONS at 244 (stating that the "charge and expense" of erecting and building two courthouses and prisons in two counties will be defrayed by the those counties and assessed with the public and county levy); PROCEEDINGS OF THE CONVENTIONS at 293 (resolving that the rivers Potowmack and Pocomoke "ought to be considered as a common high-way, free for the people of both [Maryland and Virginia], without being subject to any duty, burthens or charge"). As the Resolution adopted at the Proceedings of the Conventions in 1776 demonstrates, a "burthen" meant the burden of a payment owed, such as a charge for use of a river. *See* PROCEEDINGS OF THE CONVENTIONS at 293. A "burthen" is now more commonly called a "burden" and is used as a general term referring to a duty, responsibility, encumbrance, or obligation imposed on a person or property. BLACK'S LAW DICTIONARY at 208, WEBSTER'S DICTIONARY at 165.

A "tax" is a charge, usually of money, imposed ordinarily by a governmental authority on persons or property for public

---

conventions and in the session laws enacted by the Legislature provide the best resources.

**11.** The word "aid" was not used in any other part of the 1776 version of the Declaration of Rights or Constitution, but it does appear in several instances in PROCEEDINGS OF THE CONVENTIONS, in which "aid" meant the act of help or help given.

purposes.[12] BLACK'S LAW DICTIONARY at 1496; WEBSTER'S DIC-
TIONARY at 1280. A review of the Declaration of Rights and
the Constitution reveals that the definition of tax has not
changed since 1776. A "fee" is a charge for labor, services, or
a privilege. BLACK'S LAW DICTIONARY at 647; WEBSTER'S DIC-
TIONARY at 459. This definition also has not changed since
1776. *See* Chapter xxv, § 9, of Acts of 1779 (setting out a list
of the fees to be charged for carrying out various judiciary
duties and the rates of tobacco to be accepted as payment);
Chapter xv, § 4 of the Acts of 1769 (providing that "any fee or
fees" claimed to be due to the sheriff under color of office shall
be explained to the person paying the fee and a receipt given
upon payment).

These five kinds of payment, especially "charge" and "fee,"
encompass a wide variety of payments to the government.
One shared sense of the words, however, is that they are all
used in Article 14 to mean payments imposed by a sovereign
on its citizens. That the drafters chose to include all five
terms in the provision tends to show that the drafters intend-
ed that the scope of Article 14 encompass virtually all pay-
ments imposed by the government. Additionally, the clause
"under any pretense" modifies the clause: "That no aid,
charge, tax, burthen or fee ought to be rated or levied." We
construe this language to mean that calling a true aid, charge,
fee, tax, or burden by a different name (such as "commission")
will not shield the exacted payment from the scope of Article
14.

The telephone commission provided for in § 10–503 fits
within these broad terms—it is certainly a cost paid to the
State by the telephone company and thus fits under the

---

**12.** The State's imposition of a tax carries due process considerations:
the tax must have a definite link between the state and the person,
property, or transaction that it seeks to tax. *Miller Brothers Company v.
Maryland*, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954). In the
present case, the telephone commission is related to a public purpose,
providing services to the inmate population. No party to the present
litigation has characterized the telephone commission as a tax; hence,
we have no need to inquire into due process requirements on that basis.

general term "charge." The commission is also a "fee" from the point of view of the person accepting the inmate's collect, non-emergency telephone call because the recipient indirectly pays the commission. The State in the present case, citing *Goldsborough v. Postal Telegraph Cable Company,* 123 Md. 73, 91 A. 147 (1914), argues that the telephone commission is not implicated by the terms of Article 14 because it is paid as part of a "voluntary" commercial transaction and the commission is taken from charges collected by a third-party for telephone service provided at a State facility. This Court's decision in *Goldsborough,* however, does not support the State's argument because the Court did not hold that a commercial transaction involving the State as a party is exempt from Article 14. In *Goldsborough,* the State sought payments due on a lease originally executed between the former private owner of a bridge (the State purchased all property and rights to the parcels containing the bridge) and a telegraph company running telephone lines across the adjacent land and bridge. The telegraph company argued that it could not be required to make payments to the State as the successor lessor under the lease because the Legislature had not specifically consented to the payments. The Court found that the lease had been purchased by the State with the authorization of the Legislature by way of a statute directing the acquisition of the bridge. The fact that the lease payments were created by a pre-existing contract between two private parties distinguishes *Goldsborough* from the present case. The telephone commission in the present case was born of § 10–503 and is a charge imposed by the State government. Thus, the State's argument fails.

iii.

*Construction and Application of Article 14*

As noted *supra,* Article 14 provides that "no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature." We now consider the plain meaning of the terms: rated, levied, and consent.

"Rated," when used as a verb with regard to money, means to allot or to value. WEBSTER'S DICTIONARY at 1032. In laws passed in the 1770s, use of the verb "rate" was specifically tied to money—either fines, taxes, or fees paid to government officials. *See* Chapter xx of the Acts of 1773 (providing that the sheriff shall be fined by the court's justices for certain conduct, a sum not exceeding three thousand pounds of tobacco, "rating tobacco at ten shillings per hundred, to be applied towards defraying the charge of the said county"); Chapter xvii of the Acts of 1782 (providing that the appointed collector of certain specified taxes must record in a book "the persons rated and things assessed, to call upon the county commissioners of the tax to know the yearly valuation of property within said town, and to regulate the tax upon every hundred pounds worth of property").

"Levied," used as a verb, means to impose or to collect payment of money or property by legal authority or to require by authority. WEBSTER'S DICTIONARY at 715. This definition appears to have remained constant since the time Article 14 was adopted in 1776. *See* PROCEEDINGS OF THE CONVENTIONS at 160 ("Resolved, That the committee forbear to levy the said fines until the end of the next session of convention, and to stay all further proceedings therein."); PROCEEDINGS OF THE CONVENTIONS at 157 ("And, upon non-payment thereof may, by warrant under their hands, empower any person they shall judge proper to levy the same, by distress and sale of the goods of the offender."); PROCEEDINGS OF THE CONVENTIONS at 256 ("[A]n act of assembly passed, directing the justices of Talbot county to levy on the inhabitants of that county forty-five pounds of tobacco per tax. . . .").

The most significant term in Article 14 is "consent" because it is an imperative directed to the Legislature. To "consent" is to voluntarily give assent, to agree, or to approve. WEBSTER'S DICTIONARY at 265. Its modern meaning is consistent with its 1776 meaning. *See* Chapter vii, § 9 of the Acts of 1777 (providing that a male under the age of 21 or a female under the age of 16, not before married, shall not be married "without the consent of the parent or guardian of every such

person" or else the minister be forced to pay 500 pounds current money); PROCEEDINGS OF THE CONVENTIONS at 299 (providing, in a draft of the Declaration of Rights under consideration and later adopted with amendments, that "no soldier ought to be quartered in any house in time of peace without the consent of the owner, and in time of war in such manner only as the legislature shall direct").

The plain meaning of the pertinent language therefore is that payments imposed by the State should not be allotted, valued, imposed, or collected without the authorization or approval of the Legislature. The structure of the sentence is important. The Framers did *not* express their will in the imperative: The Legislature shall rate and levy taxes and charges. Rather, the Legislature must consent to the rate or levy of payments to the State. To read into the clause a requirement that the Legislature also must set the amount of all such payments in each instance is to depart from the Article's plain language and read into it an intent that is not evident.

Our review of the available written records from the creation of Article 14 reveals no intention to impose a non-delegable duty upon the Legislature to set the amount of every government charge. Article 14 was part of the original Declaration of Rights, although it then was designated Article 10. Appellants cite notable historical texts and cases in their Brief for the proposition that the Framers intended that the Legislature be required to set the amount of all aids, charges, taxes, burdens, and fees as a retaliation against the Proprietary fee system in effect in Maryland before Independence. Having reviewed these texts and others, we conclude that, though they do provide context and illumination for our interpretation of Article 14, they do not support Appellants' argument.

The Proprietary structure enforced in Maryland while it was a colony of Great Britain allowed the proprietor and his agents to set fees and charges without the approval of the officials elected by the citizens of Maryland. It was the *lack of consent* by the people's legislative representatives that was

denounced as the evil which the Framers of the Maryland Constitution sought to remedy. Our construction of the meaning of the Article is strengthened by a statement from the Constitutional Convention in 1776 that provided instructions for the deputies representing Maryland in Congress. If reconciliation could be reached with the British crown, then the representatives should

> tak[e] care to secure the colonies against the exercise of the right assumed by parliament to tax them, and to alter and change their charters, constitutions, and internal polity, without their consent,—powers incompatible with the essential securities of the lives, liberties, and properties of the colonists.

*Proceedings of the Conventions* at 83. In 1775, the convention resolved unanimously that, because of the "long premeditated, and [then] avowed design of the British government, to raise a revenue from the property of the colonists, without their consent, on the gift, grant, and disposition of the commons of Great Britain" and other reasons, it was "firmly persuaded that it [was] necessary and justifiable to repel force by force, [so did] approve of the opposition by arms, to the British troops employ[ed]." PROCEEDINGS OF THE CONVENTIONS at 17–18. Article 14 codifies the catch-phrase of the Revolution: No taxation without representation.

Article 14 has undergone only one arguably substantive change since its adoption in the Constitution of 1776. At the Constitutional Convention of 1850–1851, the provision was amended from: "That no aid, charge, tax, burthen, fee, or fees, ought to be *set*, rated or levied, under any pretense, without the consent of the legislature" to "That no aid, charge, tax, burthen or fees, ought to be rated or levied, under any pretense, without the consent of the Legislature," removing the word "set" from the provision. The records of the proceedings, committee reports, and debates of the 1850–1851 Convention offer little assistance in understanding why the change in language occurred. Apparently, the original version of Article 14 (then numbered Article 12) immediately preceding the Convention was passed out of committee without

change. During the Convention proceedings, Article 14 was read aloud and no amendments were offered by the Convention members. Evidently, no debate took place. At the publication of the post-convention version of the Declaration of Rights and Constitution, however, the word "set" disappeared. With the removal of the word "set," however, it became even plainer that the Legislature is not required to set expressly the amount of each aid, charge, tax, burden, or fee imposed by the State.

Having construed Article 14 to include within its scope the telephone commission here and having found that Article 14 requires the Legislature's consent before a governmental charge or fee may be rated or levied by a body to which the power of setting the amount of the charge or fee has been delegated, we must determine whether the Legislature consented to the telephone commission at issue in this case.

The Legislature enacted §§ 10–502 and 10–503, which set up the Inmate Welfare Fund and financed it by the "profits derived from the sale of goods through the commissary operation and telephone and vending machine commissions." § 10–503(a)(2)(i)(1). We think this is clear evidence of the Legislature's consent to the imposition of a telephone commission. We hold, therefore, that the telephone commission charge does not violate Article 14 of the Maryland Declaration of Rights.[13]

### iv.

### *Application of Article 8*

Appellants argue that the telephone commission concomitantly violates separation of powers principles. Article 8 of

---

13. Appellants seem to concede in their respective, last amended Complaints that the Legislature consented to the setting of the charge by the Executive agency, asserting as part of its Article 8 argument that to do so was an impermissible delegation of power, stating that "[t]he State executive's unilateral determination ... of the [commission] ... is an impermissible delegation of the legislative function" and that the "[g]eneral authorization of such an imposition, while allowing the executive branch to set the specific amount, violates the express separation of powers provisions of the Maryland Constitution."

the Declaration of Rights provides that the "Legislative, Executive, and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." In 1922, the Court held that there are certain powers only the Legislative body possesses and which it may not delegate. One of these nondelegable powers is to enact legislation. In *Brawner v. Curran*, 141 Md. 586, 601, 119 A. 250 (1922), we examined a statute that was to be submitted to qualified voters in the State general election of 1922. The statute proposed to afford compensation to persons who served in active duty during World War II. The enactment provided that it must be accepted by the voters of Maryland by referendum in order to become effective. *Brawner*, 141 Md. at 592, 119 A. 250. We held the enactment unconstitutional as an unlawful delegation in contravention of separation of powers principles. We based our conclusion on the text of Article III, §§ 1 (Legislature shall consist of two branches), 27 (bills originate in either House of the General Assembly, three readings required), 28 (majority required for passage of bill or resolution, vote shall be recorded), 29 (style and subject-matter of laws), and 30 (presentment to Governor of bills passed) and Article II, § 17 (Governor to approve bill by signature or reject it by return with objections noted) of the Maryland Constitution. These provisions of the Constitution, we concluded, "confer upon the General Assembly of Maryland the exclusive power of making laws in that State" because the provisions "definitely and inevitably place the responsibility for the enactment of such laws upon each branch of the General Assembly and upon the Executive [with veto powers]." *Brawner*, 141 Md. at 601, 119 A. 250.[14]

---

14. Our reasoning was based on two grounds:

one, that the people of Maryland, having delegated to the Legislature of Maryland the power of making its laws, that body could not legally or validly redelegate the power and the authority thus conferred upon it to the people themselves; and two, that the people of the State, from whom the Legislature itself derives its powers, having pre-

██ Our construction of Articles 14 and 8 is consistent
with *Brawner* because we do not here hold that the Legisla-
ture may delegate the power to enact laws.[15] The Legislature
must authorize the imposition of government charges for such
charges to be valid. The Legislature, however, may choose to
delegate the discreet power of setting the amount of govern-
ment charges so approved to an Executive Branch agency or
other governmental body without violating the separation of
powers explicitly provided by the Constitution because the
setting of fees and taxes is a delegable power. We have so
held in *Burgess v. Pue*, 2 Gill 11 (1844) and *Baltimore v. State*,
15 Md. 376 (1860). *See also State v. Smith*, 305 Md. 489, 510–
11, 505 A.2d 511, 522 (1986) (citing *Baltimore v. State* with
approval and stating that the branches of state government
are separate, but not completely so).

In *Burgess v. Pue*, the legislative enactment at issue provid-
ed that a primary school tax be determined and set by the
inhabitants of the school district.[16] The Court held valid the
Legislature's delegation of these powers to the people paying
the tax, stating that

> there is nothing in the Constitution prohibitory of the
> delegation of the power of taxation, in the mode adopted, to
> effect the attainment of it; we may say that grants of

---

scribed in the Constitution of the State the manner in which its laws
shall be enacted, it is not competent for the Legislature to prescribe
any other or different way in which its laws may be enacted.
*Brawner*, 141 Md. at 595, 119 A. 250. Thus we opined, "if the
Legislature cannot delegate to the people the law making power which
the people delegated to them, then it cannot pass a valid act which can
only become a law in the event that the people of the State approve it."
*Brawner*, 141 Md. at 599, 119 A. 250.

**15.** Like the analytical approach in *Brawner*, we look to the text of the
Constitution to determine whether a power granted to the Legislature is
delegable.

**16.** The enactment also provided that the inhabitants elect the tax
collector of the tax. Because the tax collector was not so elected, the
Court found that the putative collector lacked any legal authority to act.
Therefore, the *replevin* action instituted by the plaintiff properly was
sustained by the lower court. It was necessary, nonetheless, for the
Court to review the legality of the enactment at issue.

similar powers to other bodies, for political purposes, have been coeval with the Constitution itself, and that no serious doubts have ever been entertained of their validity.

*Id.*[17] Again, in *Baltimore v. State*, the Court upheld a statute delegating the power to levy a tax, but this time to an Executive Branch body. The law at issue created a Police Commission authority in Baltimore City, authorized it to govern the City's police force, set its own budget, and required the City to levy taxes to fund the Commission's budget. The City, like Appellants in the present case, argued that the law violated separation of powers principles because the Legislature delegated its authority to set fees and taxes. The Court concluded that Article 8 "is not to be interpreted as enjoining a complete separation between these several departments," based upon evidence of "contemporaneous construction, and acquiescence by the people, and the various departments of the government." *Baltimore v. State*, 15 Md. at 457–58 (citing *Burgess* ). Furthermore, the Court observed that

> [t]he power to levy taxes is a sovereign power, and unless committed to some portion of the people, may always be exercised by the Legislature. It is not to be considered as parted with by mere construction, and we have not been referred to any portion of the Constitution which divests it.

---

**17.** Some confusion apparently exists as a result of the Court's decision in *State v. Mayhew*, 2 Gill 487 (1845), which found that the General Assembly successfully levied a tax when "[t]he assessment of the stock having been made, and the *rate of taxation prescribed*, and the obligation for its payment being imposed on the bank officer; everything has been done by the Legislature, which *is requisite for it to do*, to render the tax available to the State." *Mayhew*, 2 Gill at 497–98 (Emphasis added). Appellants argue in their Brief in the present case that *Mayhew* stands for the proposition that the Legislature is obligated to set the rate or amount of each revenue measure. We disagree. In his opinion for the Court in *Mayhew*, Judge Dorsey concluded that the Legislature could delegate the power to levy taxes to the levy courts or county commissioners, both of which were representatives of the Judiciary and Executive branches of government, respectively. *Id.* Nevertheless, *Mayhew* is inconsistent with *Burgess v. Pue*, decided one year before *Mayhew*, and *Baltimore v. State*, decided in 1860. No opinion after *Mayhew* seems to "require" that the Legislature prescribe the rate of taxation specifically. Accordingly, the somewhat anomalous reasoning in *Mayhew* has been limited to its facts.

\* \* \*

Under the old system of levy courts, and tax commissioners, when appointed by the executive, it was never said that they had not power to make assessments and levy taxes. They were not elected by the people, nor accountable to them. They were appointed, under legislative authority, by the executive, and the State exercised its supreme power of taxing the people through their agency. *So here, the State chooses to substitute Commissioners in the place of the city authorities for the purpose of levying this tax, and we see no sufficient reason for denouncing the law on that account. That such a power may be delegated, see Burgess v. Pue,* 2 Gill 11.

*Baltimore v. State,* 15 Md. at 467–68 (Emphasis added). Thus, the Court held that the power to levy the specific amount of the tax was delegable. Many years later, in *Christ v. Department of Natural Resources,* 335 Md. 427, 444–45, 644 A.2d 34, 42 (1994), we stated that clearly the Legislature "cannot delegate a function which the Constitution expressly and unqualifiedly vests in the General Assembly itself," such as the power to impeach, enact statutes, or propose constitutional amendments. We failed then to include in the list of non-delegable powers the power to set the amount of government charges. The omission was intentional.

■■■ Furthermore, this Court repeatedly has noted that Article 8 of the Maryland Declaration of Rights does not impose a complete separation between the branches of government. *Christ,* 335 Md. at 441, 644 A.2d at 40 (Internal quotations omitted) (citing *Judy v. Schaefer,* 331 Md. 239, 261, 627 A.2d 1039, 1050 (1993); *Dep't of Transp. v. Armacost,* 311 Md. 64, 81, 532 A.2d 1056, 1064 (1987); *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975)). The delegation by the Legislature of legislative powers to Executive Branch agencies does not by itself usually violate Article 8 if "guidelines or safeguards, sufficient under the circumstances, are contained in the pertinent statute or statutes." *Id.* (Citations omitted). Guidelines, howev-

er, are not required uniformly by the Constitution in all cases. The Court has "relaxed" the necessity for the same many times "in light of the complexity of modern conditions with which government must deal." *Id.* (citing *Pressman v. Barnes*, 209 Md. 544, 555, 121 A.2d 816, 822 (1956)).

In *Lussier v. Maryland Racing Commission*, for example, we observed that when the Legislature grants broad power to an Executive Branch agency to promulgate regulations in a given area, the agency's regulations are valid unless they contradict the Legislature's express language or purpose in enacting the statute. 343 Md. 681, 688, 684 A.2d 804, 807 (1996). "We have repeatedly rejected the argument . . . that the Legislature [is] required expressly or explicitly to authorize the particular regulatory action." *Id.* Therefore we ask: does § 10–503, which authorizes the imposition of the telephone commission, and § 3–702 of the State Finance and Procurement Article of the Maryland Code, which grants broad powers to regulate telephone services for State government, properly delegate the power to set the amount of the telephone commission to the Department of Budget and Management (DBM)? [18] We conclude that the Legislature delegated that power properly because § 10–503 created a "commission" but did not set an amount and § 3–702 of the State

---

18. Maryland Code (1985, Repl.Vol.2001), State Finance and Procurement Article, § 3–702 provides, in pertinent part:

(a) *In general.*—The Department [of Budget and Management] shall:
(1) coordinate the development, procurement, management and operation of telecommunication equipment, systems, and services by State government;
(2) acquire and manage common user telecommunication equipment, systems, or services and charge units of State government for their proportionate share of the costs of installation, maintenance, and operation of the common user telecommunication equipment, systems, or services;

\* \* \*

(5) advise units of State government about planning, acquisition, and operation of telecommunication equipment, systems, or services.

Section 3–701 of the State Finance and Procurement Article provides that the definition of "telecommunication" is "the transmission of information, images, pictures, voice or data by radio, video or other electronic or impulse means."

Finance and Procurement Article of the Maryland Code grant-ed broad authority to personnel of the DBM to procure telephone services for State government. Also, the existence of the telephone commission and its rates are consistent with the Legislature's intent to raise revenue to finance the Inmate Welfare Fund.

We recognize that administrative agencies have become essential to the State's operation. Though administrative agencies are essential, the Court is bound to ensure that those agencies act within the confines of their delegated powers. Here, we conclude that the DBM acted within its delegated power.

We therefore hold that the Legislature validly delegated the power to set the rate of the telephone commission by its broad grant of authority to the DBM to regulate the operation of telephone systems in the State's correctional facilities and by the creation of the Inmate Welfare Fund to be funded by a commission to be charged on non-emergency, collect telephone calls placed by inmates. Because the power to set fees and charges may be delegated to administrative agencies, § 10–503 does not violate Article 8 of the Declaration of Rights.

We conclude also that the absence in § 10–503 of direction for fixing the amount of the telephone commission does not violate separation of powers principles because there exists a legislative check on the Executive agency-established fee schedule. The Legislature is aware of the fee schedule and may, if it chooses, change it at anytime.[19]

---

**19.** The Legislature annually approves appropriations of money from the Fund. In so doing, it reviews the total amount raised by the commissary operation and telephone and vending machine commissions. In 2001, the Legislature demanded a study and report on the telephone commissions at issue. In 2002, the Legislature failed to enact a bill that would have prohibited the taking of commissions on inmate collect phone calls. House Bill 839–2002 (reported unfavorably by the House Commerce and Government Matters Committee on 20 March 2002). The telephone commission is negotiated between the private telephone companies and the Department of Budget and Management and must be approved, after a public hearing, by of the Board of Public Works.

IV.

*Consumer Protection Act*

Appellants asserted in their complaints that the telephone commission violates the Maryland Consumer Protection Act (CPA), codified as Maryland Code (1975, 2005 Repl.Vol.), Commercial Law Article, Title 13. We thus are required to decide whether the CPA governs the State's conduct here.

Whether the CPA governs the State's conduct is a matter of statutory interpretation and a matter of first impression for the Court.[20] The primary canon of statutory interpretation is to ascertain and effectuate the legislature's intent. *Comptroller of the Treasury v. Citicorp Int'l Communications, Inc.,* 389 Md. 156, 165–66, 884 A.2d 112 (2005); *Rockwood Casualty Ins. Co. v. Uninsured Employers' Fund,* 385 Md. 99, 108, 867 A.2d 1026, 1031 (2005). We look first to the plain meaning of the language chosen by the Legislature. If the words of the statute are plain and unambiguous, then the Court will give effect to the statute as written and will refrain from adding or deleting language to reflect an intent

---

**20.** No reported Maryland appellate opinion has determined whether the CPA applies to the activities of the State. In *Stern v. Board of Regents,* 380 Md. 691, 846 A.2d 996 (2004), the plaintiff students of various campuses of the University of Maryland sued to enjoin the Board of Regents from implementing a mid-year tuition increase. Plaintiffs asserted, among other theories, a CPA complaint. *Stern,* 380 Md. at 694, 846 A.2d at 998. At the 15 April 2003 motions hearing, the Circuit Court for Baltimore City granted the Regents' motion for summary judgment on the CPA count. After reviewing the CPA, its legislative history, and relevant case law, the court found no indicia supporting the contention that the CPA applied to the State, pointing out that "there's no reference whatsoever as to whether it is to be applied to institutions ... such as the Board of Regents here." *Reporter's Transcript* at 91–92. The Circuit Court recited the general rule that

it is well established that statutory provisions which are written in such general language, that they are reasonably susceptible to being construed as applicable to both the government and to private parties, are subject to a rule of construction which exempts the government from their operation in the absence of other particular indicia supporting a contrary result in particular instances.

*Id.* at 91. On appeal, this question was not advanced and, accordingly, was not decided by this Court.

not evidenced in that language. *Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557, 566 (2003). Hence, we examine the CPA's language to determine whether the Legislature intended for the CPA to apply to the activities of the State.

Appellants argue that the CPA applies to the State's conduct because the CPA broadly applies to all sales of services primarily for personal, household, or family purposes, and thus includes the collect call telephone charges accepted by Appellants. This argument fails because, while the CPA applies broadly to the kinds of sales it governs, the statute also describes the actors to whom it applies and the State is not included in that description.

The State contends that the legal principle applied in *Lomax v. Comptroller,* 323 Md. 419, 593 A.2d 1099 (1991), applies to our analysis of the CPA. We agree. In *Lomax,* this Court applied the general principle that, when construing a statute whose language is written in general terms that are reasonably susceptible to being construed as applicable to the conduct of both governmental and private parties, the rule of construction to be applied is to exclude the government from the statute's operation unless the Legislature provides particular indication in the language that it intended to include the State in its sweep. *Lomax,* 323 Md. at 421–22, 593 A.2d at 1100; *see also Glascock v. Baltimore County,* 321 Md. 118, 121, 581 A.2d 822, 824 (1990) (holding that the Legislature did not intend the State to be bound by local zoning regulations when constructing a communications tower because the Legislature "neither named the State nor manifested an intention that it be bound by the provisions of the enabling act which granted zoning authority to the City"); *City of Baltimore v. State,* 281 Md. 217, 223, 378 A.2d 1326, 1330 (1977) (holding that, because no clear implication could be derived from the language of the statute that the State should be bound by the local zoning ordinances, the State was not bound); *Harden v. Mass Transit Admin.,* 277 Md. 399, 413, 354 A.2d 817, 824 (1976) (holding that the Mass Transit Administration (MTA) was not obligated to conform to the personal injury protection insurance coverage requirements imposed by statute because

"there was no manifest intention demonstrated on the part of the General Assembly to include MTA within the 'no fault' insurance provisions and that if it had intended to include MTA within those provisions it would have made a specific provision to that effect"); *State v. Milburn*, 9 Gill. 105 (1850) (holding that the State was not obligated to conform to the law requiring that the paper instrument of a state investment bond bear a tax stamp in order to be enforceable, where the state investment bond was to be transferred by an individual to the State as payment for an obligation, because there was no indication that the Legislature intended for the requirement to apply in such a case).[21]

We apply this principle to the CPA. The statute does not declare explicitly that it applies to the State. It lays out, however, a detailed regulatory scheme, listing prohibited practices, the covered actors in those practices, and the mechanisms for enforcement of the statute. Thus, for example, a "person" may not engage in any "unfair or deceptive trade practice" in the "sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services" or

---

**21.** In *City of Annapolis v. Anne Arundel County*, 271 Md. 265, 316 A.2d 807 (1974), the Court held that the historic landmark preservation statute enacted by Anne Arundel County governed the City of Annapolis, giving to the County the authority to deny the City's request for a demolition order of a historic building. Justifying this result, the Court discerned an implied legislative intent indicated by the purpose for the law:

> the historically or architecturally valuable building is just as much lost by destruction by a public body as it would be by a private owner ... The General Assembly could well conclude that, to accomplish historic and architectural preservation, the jurisdiction of the Commission should extend to all owners be they private persons or governmental agencies.

*City of Annapolis*, 271 Md. at 291, 316 A.2d at 821. We observe that the conclusion and reasoning of *City of Annapolis* appears to be an anomaly, and, though not one disavowed expressly by the Court, is no longer followed. The subsequent cases on point (*Lomax, Glascock, Nationwide, City of Baltimore*, and *Harden* ) have painted *City of Annapolis* into a tight jurisprudential corner. We apply here the rule observed in the subsequent cases, not only to be consistent with the greater precedent, but also because the rule is based upon a reading of the statute's language to discern the Legislature's intent.

the offer of such. § 13–303. A "person" is defined as including "an individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." § 13–101(h).

An "unfair or deceptive trade practice," includes but is not limited to, any "[f]alse, falsely disparaging or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," certain representations concerning goods, and the "[f]ailure to state a material fact if the failure deceives or tends to deceive." § 13–301 (the section also contains a detailed list of practices that constitute an unfair or deceptive trade practice). Any practice prohibited by the Act is a violation, whether any consumer was in fact misled, deceived, or damaged as a result of the practice. § 13–302. Damages are considered in the remedy and penalty phases of enforcement. § 13–408(a).

The CPA exempts from its application certain professional services by licensed professionals, a "public service company, to the extent that the company's services and operations are regulated by the Public Service Commission," and television, radio, and print media who publish a third-party advertisement without knowledge that the advertisement violates the CPA. § 13–104.

The statutory scheme establishes the Division of Consumer Protection in the Office of the State Attorney General, sets forth its power and duties, gives it rule-making and civil penalty-setting powers, provides it the ability to issue cease and desist orders based on findings made after a public hearing, allows it to recover the costs accrued in actions that it institutes, and permits it to hold administrative hearings and request criminal penalties for violations of the CPA. §§ 13–201, 13–204, 13–205, 13–403, 13–405, 13–409, 13–410, 13–411. In addition to actions brought by the Consumer Protection Division, the Act authorizes any "person" to file a private action "to recover for injury or loss sustained by him as the

result of a practice prohibited by this title," and, if that person is successful, he or she may seek recovery of reasonable attorney fees for his or her attorney's efforts. § 13–408(a)–(b). It is under this Section of the CPA that Appellants brought their claims.

Throughout the CPA, the State and its agencies serve multi-faceted roles as investigator, enforcement officer, and quasi-judicial adjudicator—holding hearings and setting civil penalties. The Legislature did not contemplate, apparently, the State as a "person" within the coverage of the proscribed activities depicted in the CPA. We find no manifest intent in the language of the statute that the State's entrepreneurial revenue-raising activities were to be regulated by the CPA.

We hold, therefore, that the CPA does not regulate the State's conduct in the present case. To hold otherwise would be to construe the CPA to reflect an intent not evidenced in its language and give the law a strained construction. Because we find that the CPA does not regulate the State's conduct, it is unnecessary to decide whether sovereign immunity protects the State from liability for a violation of the CPA.

## V.

### *The Common Law Actions of Unjust Enrichment and Money Had and Received*

We next decide whether the Circuit Court correctly dismissed the common law counts of unjust enrichment and money had and received. We shall affirm the court's judgment.

Appellants argue that, because the telephone commission is illegal, retention of the benefits it conferred would be inequitable as unjust enrichment. A claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without

the paying of value in return. *Caroline County v. Dashiell,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000) (Citations omitted).

Appellants failed to allege precisely why the collection of the telephone commission is an act of unjust enrichment, stating only that it "would be inequitable, for reasons stated *supra.*" We assume that Appellants are referring to their allegations of: violations of Articles 14 and 8, and the CPA. We held *supra* that the State violated neither Article 14 nor Article 8. Moreover, we held *supra* that the CPA does not apply to the State's conduct here. Thus, there is no wrongful conduct upon which Appellants may rely to support a claim for unjust enrichment. The Circuit Court's dismissal of the unjust enrichment claim was correct.[22]

Appellants contended that the facts "establish the analogous cause of action under Maryland law for money had and received," citing *Electro–Nucleonics, Inc. v. Washington Suburban Sanitary Commission.,* 315 Md. 361, 554 A.2d 804 (1989), for the proposition that this Court recognized the ability to bring a common law action for money had and received in the context of a State constitutional violation. Our finding in *Electro–Nucleonics, Inc.,* however, was not so expansive. Rather, we stated, the money had and received action could be brought in the context of an unconstitutional taking claim. *Electro–Nucleonics, Inc.,* 315 Md. at 372, 554 A.2d at 809. Reliance on *Electro–Nucleonics, Inc.* is misplaced in the present posture of this case where the Article 24 claim has been abandoned on appeal.

The action for money had and received is a common count used to bring a restitution claim under the common law writ of assumpsit. *Ver Brycke v. Ver Brycke,* 379 Md. 669, 698 n. 13, 843 A.2d 758, 775 n. 13 (2004). We have stated that this count "lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be

---

22. Appellees argue that the unjust enrichment claim also must fail because the voluntary payments rule is a valid defense. Because of the scope of our holding, it is unnecessary to consider that argument.

allowed to retain." *State, Use of Employment Sec. Bd. v. Rucker,* 211 Md. 153, 126 A.2d 846 (1956) (quoting POE ON PLEADING, § 117 (Tiffany Edition) and citing *Moses v. Macferlan,* 2 Burr. 1005 (1760)). A money had and received count may lie where the defendant receives the money as a result of a mistake of law or fact and did not have a right to it. Because we concluded that the State's imposition of the telephone commission does not violate the Declaration of Rights or the CPA and does not confer an unjust benefit on the State, the action for money had and received was dismissed properly.

## VI.

### *Plaintiff's Post–Judgment Motions*

 Finally, we determine whether the Circuit Court erred in denying Appellants' post-judgment motions seeking to amend their complaints. The applicable standard of review is whether the Circuit Court abused its discretion. *Renbaum v. Custom Holding, Inc.,* 386 Md. 28, 42–43, 871 A.2d 554, 563 (2005).

Rule 2–534 of the Maryland Rules provides:

In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgement to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgement, or may enter a new judgment.

 The Circuit Court has broad discretion whether to grant motions to alter or amend filed within ten days of the entry of judgment. Its discretion is to be applied liberally so that a technicality does not triumph over justice. *Bd. of Nursing v. Nechay,* 347 Md. 396, 408, 701 A.2d 405, 411 (1997) (Citations omitted). We stated in *Board of Nursing v. Nechay* that "whether the court entertained a reasonable doubt that justice had not been done is an appropriate basis for the exercise of that discretion." *Id.* (citing *Henley v. Prince George's County,* 305 Md. 320, 328, 503 A.2d 1333, 1337 (1986);

*J.B. Corp. v. Fowler,* 258 Md. 432, 434–36, 265 A.2d 876, 877–78 (1970); *Clarke Baridon v. Union Asbestos & Rubber Co.,* 218 Md. 480, 483, 147 A.2d 221, 222–23 (1958)).

Rule 2–535(a) provides that, generally, "[o]n motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534." Rule 2–535(b) provides that "[o]n motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity."

Here, Appellants filed their first motion to alter or amend the judgment on 2 July 2004, seven days after the Circuit Court entered its order on 25 June 2004 that their claims be dismissed for failure to state a claim upon which relief may be granted. Appellants filed their Second Motion to Alter/Amend the Judgement on 13 September 2004—more than 30 days after entry of the court's pertinent judgment. The court denied both motions. Rule 2–534 is not implicated by the second motion to alter or amend because that motion was not filed within ten days of the entry of judgment. With regard to Rule 2–535(a), which applies to the court's power to revise its judgments generally, Appellants' second motion was filed more than 30 days after the entry of judgment. Thus, Rule 2–535(a) is not implicated. Because Appellants did not allege facts in their second motion that evince fraud, mistake, or irregularity, the second motion moreover is not one filed pursuant to Rule 2–535(b), which allows such a motion to be filed at any time. *See also Pickett v. Noba, Inc.,* 122 Md.App. 566, 573, 714 A.2d 212, 215 (1998), *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998) (concluding that a second motion to revise the judgment that did not claim fraud, mistake, or irregularity and "filed more than thirty days after the entry of judgment, even though within thirty days after denial of the first motion, cannot be granted"). Thus, the trial court acted within its discretion in denying Appellants' second motion.

The first motion to alter or amend advanced three proposed additional allegations to be added to Appellants' already much-amended complaints: (1) that each plaintiff has suffered actual injury related to the matters in the complaint; (2) defendants engaged in antitrust activity and/or unlawfully exercised anti-competitive power; and (3) defendants engaged in a threatened and/or actual monopoly by their imposition of the telephone commission. We conclude that these additional allegations to alter or amend would not have changed the trial court's judgment. Therefore, the Circuit Court did not abuse its discretion in denying the first motion because the allegations contained therein did not supply "reasonable doubt that justice had not been done" by the court's judgment.

The first additional allegation, that Dean suffered actual injury, would not change the outcome of the case because, even had the court considered the allegation, it would have dismissed Dean's complaint nonetheless for the same reasons that it dismissed Benson's complaint. We know this to be so because the court dismissed Benson's complaint, where it had been properly alleged that she suffered actual injury. Benson's complaint was nearly identical to Dean's complaint.

The second and third new allegations regarding Appellants' antitrust claims would also not change the outcome of the case because the new allegations would not impact the trial court's reasoning. The court concluded that the antitrust claims were barred by sovereign immunity, among other reasons. It therefore dismissed Appellants' antitrust claims. Even had the court considered the second new, wholly conclusory allegation, that defendants engaged in antitrust activity and/or unlawfully exercised anti-competitive power, or the third new allegation, that defendants engaged in a threatened and/or actual monopoly by their imposition of the telephone commission, it nonetheless would have dismissed the claims based on sovereign immunity principles.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE DIVIDED EQUALLY BY APPELLANTS.